United States District Court
Eastern District of New York



ORIGINAL

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT NY
JAN 14 2003
P.M. _____
TIME P.M. _____
TIME A.M. _____

DAVID SEIDEMANN
38 Garfield Avenue
North Haven, CT 06473

personally and in his capacity as
a member of the Brooklyn College faculty

      Plaintiff,

      -against-

            **SECOND AMENDED COMPLAINT**

            -CV- 02-3389 (SJ) (LB)

              **Pro Se**

BARBARA BOWEN,
personally and in her capacity as
President of the PSC/CUNY (Professional Staff
Congress/City University of New York)
25 West 43rd Street
New York, NY 10036
(212) 354-1252

      and

PSC/CUNY
(Professional Staff Congress/City
 University of New York)
25 West 43rd Street
New York, NY 10036
(212) 354-1252

      Defendants

Attorneys for Defendants
BRYAN D. GLASS and CHRISTOPHER CALLAGY, co-counsels
Office of General Counsel
New York United Teachers
260 Park Avenue South
New York, New York 10010-7214
(212) 533-6300

Plaintiff appearing *pro se*, for his complaint, alleges as follows:

## INTRODUCTION

1. This is a proceeding pursuant to the First Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution and 42 U.S.C. 1981, et seq. seeking an order requiring that the Professional Staff Congress/City University of New York (hereafter PSC), which serves as the exclusive bargaining representative of the faculty at the City University of New York (hereafter CUNY),

a) institute a policy that provides for a timely and adequate report of its expenditures to all agency fee payers (and thereby abandon a policy requiring fee payers to register an objection to ideological expenditures in order to receive such a report);

b) immediately provide all agency fee payers with an adequate report of its expenditures for the 2000-2001, 2001-2002, and 2002-2003 fiscal years, as well as on a yearly basis for all future fiscal years;

c) provide all agency fee payers with an opportunity to register their objections to ideological expenditures by the PSC made in the 2000-2001 and 2001-2002 fiscal years, and planned for the 2002-2003 fiscal year;

d) permit all agency fee payers who register objections to fee calculations for the 2000-2001 and 2001-2002 fiscal years, and planned for the 2002-2003 fiscal year with a prompt opportunity to challenge those calculations before an impartial arbiter;

e) immediately increase — in accord with the accurate application of the pertinent court case — the size of the escrow or advanced reduction of fees that the PSC uses to prevent the spending of objectors' fees for ideological purposes;

f) abandon its policy that makes arbitration over agency fee disputes conditional on an objector's identification of the percent of agency fees in dispute;

g) abandon its policy requiring that objections to ideological expenditures be renewed annually;

2

h) return to the plaintiff interest payments on the portion of his agency fee for the fiscal year 2000-2001 which it inaccurately claimed were used for work-related expenses;

i) financially compensate the plaintiff for the damage he suffered to his constitutional rights when the PSC obtained from him an involuntary loan for purposes to which he objects, and when the PSC unlawfully deprived him of his right to a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decision maker;

j) pay punitive damages to agency fee payers because it failed to make a good faith effort to inform fee payers about its finances.

2. This action is brought pursuant to 28 U.S.C. §1331, 28 U.S.C. §§2201, et seq., 42 U.S.C. §§1981, et seq., as to the claims which arise under the United States Constitution and the civil rights laws, and this Court's pendent jurisdiction over claims which arise under the New York State Constitution.

## THE PARTIES

3. Plaintiff is a professor at Brooklyn College.

4. Brooklyn College is a constituent part of the City University of New York.

5. The City University of New York ("CUNY") is an organization created by State law, and, upon information and belief, authorized by the State of New York and the Regents of the University of the State of New York to administer the various colleges, community colleges and graduate schools of the City University of New York.

6. The PSC is recognized by CUNY as the exclusive collective negotiating representative (under the Public Employees' Fair Employment Act) for professors at CUNY.

7. Barbara Bowen is the current President of the PSC.

## STATEMENT OF FACTS

8. The PSC and CUNY have an agreement under which CUNY deducts union fees from the paychecks of CUNY professors, and remits those fees to the PSC.

9. The PSC and CUNY have an agreement under which professors who choose not to become PSC members are subject to an "agency fee" deduction from their CUNY paychecks.

10. The agency fee deduction is equivalent to the amount of dues required of a union member.

11. The PSC pays dues to the American Federation of Teachers (hereafter "AFT") and to the New York State United Teachers (hereafter "NYSUT"), national and state labor organizations with which it is affiliated.

### *A Revised Agency Fee Procedure*

12. On November 21, 2002, the Delegate Assembly of the PSC approved a revised version of its Agency Fee Refund Procedure (hereafter "Revised Procedure"). (See Exhibit 1)

13. Under the Revised Procedure, any person making agency fee payments has the right to object to the expenditure of any part of the agency fee in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment. (See Exhibit 1, paragraph 2)

14. Under the Revised Procedure, the PSC restricts the time period for such objections (See Exhibit 1, paragraph 3): it requires that the objection be registered between May 1 and May 31 of the year prior to the fiscal year to which the objection pertains. (The PSC defines its fiscal year to be September 1 to August 31.)

15. Under the Revised Procedure, registered objections are valid for only one year: objectors must renew their objection on a yearly basis if they wish to maintain eligibility for a rebate of their pro-rata share of the union's ideological expenditures. (See Exhibit 1)

16. Under the Revised Procedure, the PSC provides information about its

expenditures to agency fee payers <u>only after</u> fee payers register an objection to ideological expenditures by the union. (See Exhibit 1, paragraph 5)

17. Under the Revised Procedure, in order to gain the opportunity to challenge the amount of the agency fee before an arbitrator, an objector "must indicate to the union local president the percent of agency fees that s/he believes is in dispute." (See Exhibit 1, paragraphs 6 and 9)

18. Under the Revised Procedure, once a fee payer registers an objection between May 1 and May 31 of the year prior to the fiscal year to which the objection pertains, the PSC will reduce the objector's agency fee for the upcoming fiscal year by the objector's prorated share of ideological expenses. (See Exhibit 1, paragraph 3)

19. Under the Revised Procedure, there is no provision for placing in escrow the portion of the agency fee that PSC alleges to be the fee payers share of employment-related expenses.

20. Under the Revised Procedure, the PSC will calculate an objector's advance reduction of the agency fee based on "the latest fiscal year's information for which there is a completed and available audited financial statement." (See Exhibit 1, paragraph 5)

### *A Financial Report to Agency Fee Objectors*

21. As of this date, the most recent audited financial statement that the PSC has made available to agency fee objectors is one that the PSC mailed to objectors in September 2002, and which pertains to the 2000-2001 fiscal year (hereafter "Report to Objectors-FY 00/01").

22. Under the Revised Procedure, the PSC will use the "Report to Objectors-FY 00/01" to calculate an objector's advance reduction for the fiscal year 2002-2003 because the former is the most recent statement that the PSC has made available to agency fee objectors.

5

23. The "Report to Objectors-FY 00/01" comprises financial reports for three separate bargaining units, the PSC, and its two affiliates, the AFT and NYSUT.

24. In the PSC portion of the "Report to Objectors-FY 00/01", the PSC reports its total expenses to be $6,471,534. (See Exhibit 2)

25. In the PSC portion of the "Report to Objectors-FY 00/01", the PSC lists the following 12 expense categories under the heading "Statement of Activities": Salaries; Fringe benefits; Depreciation and amortization; Dues to affiliated organizations; Conferences and meetings; Occupancy; Repairs and maintenance; Office supplies, printing and publishing; Postage and delivery; Professional fees; Insurance; and Other expenses. (See Exhibit 2)

26. In the PSC portion of the "Report to Objectors-FY 00/01", the PSC asserts that only $15,387 (out of its total expenditures $6,471,534) represent its "Expenditures of a Political or Ideological Nature Only Incidentally Related to Terms and Conditions of Employment." (See Exhibit 2).

27. In the PSC portion of the "Report to Objectors-FY 00/01", the PSC lists direct contributions to outside political groups ($11,575), and the costs of reporting on these contributions in its newspaper ($3,812), as the *only* ideological expenditures that it incurred in its portion of the budget. (See Exhibit 2)

28. By identifying direct contributions to outside political groups and the costs of reporting on these contributions as its only ideological expenses, the PSC alleges that *all* its other expenditures — that is, 100% of its activities, salaries and administrative costs unrelated to newspaper expenses— were related to terms and conditions of employment.

### *A More Detailed Financial Report to the PSC Delegate Assembly*

29. On December 21, 2001, the PSC distributed to members of its Delegate Assembly a report of its "actual" income and expenditures for the fiscal year 2000-2001

6

(hereafter "Report to Delegates-FY 00/01": See Exhibit 3).

30. Through its Report to Delegates-FY 00/01, the PSC provides to its delegates a more detailed accounting of its expenditures for fiscal year 2000-2001 than it does to objectors for the same fiscal year:

a) the Report to Delegates-FY 00/01 lists 45 expense categories, while the Report to Objectors-FY 00/01 lists only twelve (Compare Exhibit 2 to Exhibit 3);

b) the Report to Delegates-FY 00/01 includes a section of explanatory notes that describes the nature of the activities supported for each of 40 expense categories: the Report to Objectors-FY 00/01 includes an explanatory note for only one (Occupancy) of its 12 expense categories. (Compare Exhibit 2 to Exhibit 3)

c) the expense categories chosen for *some* of the activities listed in the Report to Delegates-FY 00/01, along with the accompanying explanations, are sufficient to determine whether those activities are related or unrelated to terms and conditions of employment (e.g., voter registration): the 12 expense categories chosen for the Report to Objectors-FY 00/01 make it impossible to judge whether the listed expenses are related or unrelated to terms and conditions of employment (e.g., "postage and delivery"). (Compare Exhibit 2 to Exhibit 3)

31. The following activities/expenses/explanations listed in its Report to Delegates-FY 00/01 are not among those that the PSC designates as ideological in its Report to Objectors-FY 00/01 (i.e., they are allegedly related to terms and conditions of employment):

a) Voter Registration 2001 ($16,750-line 56)

b) CUNY Budget Campaign ($34,385-line 55: "Covers costs of activities in Albany and at City hall to increase State and City budgets")

c) Solidarity ($15,687-line 58: "Covers the costs of activities that promote [PSC] ties to other unions, community organizations, students (e.g., labor [sic] Day Parade, participation in coalitions, meeting with student organizations)")

unions and councils in the performance of their duties as a representative of the employees in dealing with the employer on labor management issues." (Exhibit 5)

34. In the AFT portion of the "Report to Objectors- FY 00/01", the AFT asserts that 100% of its expenditures for media services "used to explain the Federation's positions in educational reform on such issues as educational changes in the profession, class size, modern methods of teaching and school structure, financial improvements, educational accountability issues, and educational restructuring of schools" were incurred for the purpose of "assisting state federations and local unions and councils in the performance of their duties as a representative of the employees in dealing with the employer on labor management issues." (Exhibit 5)

### *The Plaintiff's Objections and the PSC Response*

35. The plaintiff informed the PSC of his objection to its ideological expenditures for the fiscal years 1999/00; 2000/01; 2001/02; and 2002/03 in letters to the union of May 5, 1999; May 13, 2000; May 4, 2001; and May 3, 2002 respectively.

36. The PSC failed to offer the plaintiff a reasonably prompt opportunity for arbitration in response to any of his objections: the only opportunity the union gave the plaintiff to go before an arbitrator came in September 2002, in response to the plaintiff's objection of May 2000 to ideological expenditures made in the 2000/01 fiscal year (i.e., arbitration was offered 27 months after the objection was registered).

37. At the initial conference for this case (of September 30, 2002), the PSC acknowledged that its refusal to refund any part of the plaintiff's agency fee for the fiscal year 1999-2000 was an error on its part.

38. None of the plaintiff's agency fee for the fiscal year 1999-2000 was placed in an escrow account because the PSC erroneously believed that he was not eligible for a rebate of his share of ideological expenses for that year.

39. On November 12, 2002, the PSC returned to the plaintiff an amount of money representing his agency fee payment for the fiscal year 1999-2000, plus interest at the legal rate.

40. On September 10, 2002, the PSC returned to the plaintiff $59.14, an amount of money representing the portion of his agency fee payment that the PSC alleges was spent for ideological purposes in the fiscal year 2000-2001, plus interest at the legal rate.

40. On October 17, 2002, the PSC returned to the plaintiff $637.52, an amount of money representing the portion of his agency fee payment that the PSC alleges was *not* spent for ideological purposes in the fiscal year 2000-2001.

## CASE LAW PERTINENT TO PSC POLICIES AND ACTIONS

### *Procedures must be carefully tailored to minimize infringement on fee payers' rights*

41. *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292 (1986) held that the agency shop itself significantly impinges on First Amendment rights of a nonunion employee and "the government and union have a responsibility to provide procedures that minimize that impingement and that facilitate a nonunion employee's ability to protect his rights". (*Hudson* 475 U.S., at 307)

42. *Hudson* 475 U.S. (at 303) held that unions must carefully tailor their procedures to minimize the infringement on the First Amendment rights of nonunion employees.

43. *Hudson* 475 U.S. (footnote 11, at 303) suggests that the procedures used in regard to the agency shop must be designed to be "least restrictive" of freedom of belief and association.

### *Unions must disclose information about its expenditures to all agency fee payers*

44. *Hudson* 475 U.S. held (at 306) that unions are required to disclose information about its expenditures to agency fee payers, and may not impose a requirement that fee payers register an objection in order to receive that information: "Leaving the nonunion

10

employees in the dark about the source of the figure for the agency fee -- and requiring them to object in order to receive information..." does not adequately protect the First Amendment rights of nonunion employees. (Hudson 475 U.S, at 306)

*Unions must adequately explain the basis of the fee*

45. *Hudson* 475 U.S. held (at 310) that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee."

46. The language used throughout *Hudson* makes it evident that the union bears the burden of "proving"; "showing"; giving "an explanation"; and including "reasons" why its calculation of the nonmembers' share of chargeable expenses is justified, as the following demonstrates:

   a) the union "not the individual employees, bear the burden of proving" the proportion of political to total union expenditures (475 U.S., at 306);

   b) adequate disclosure must include "the reasons why [nonmembers] were required to pay their share" of the union's collective bargaining expenses (475 U.S., at 307);

   c) adequate disclosure must include either a "showing" that none of a the union's payment to affiliates was used to subsidize ideological activities or "an explanation" of the share that was so used (475 U.S., at 307).

47. *Hudson* 475 U.S. (at 307) indicates that an acknowledgment by the union of only its non-chargeable expenditures does not provide "an adequate disclosure of the reasons why [nonmembers] were required to pay their share" of the expenses that the union claims as chargeable.

48. *Hudson* 475 U.S. (at 307) requires that unions identify to agency shop payers *both* (a) the expenditures that it admittedly incurred for purposes that did not benefit dissenting nonmembers and (b) the expenditures that it claims to have spent for collective bargaining and contract administration.

11

49. *Hudson* 475 U.S. (at 306 - 307) indicates that an adequate disclosure of finances must include the major categories of expenses, as well as verification by an independent auditor.

50. *Hudson* 475 U.S. (at 310) indicates that if a union chooses to escrow less than the entire amount of the agency fee, it must carefully justify the limited escrow on the basis of an independent audit.

51. *Hudson* 475 U.S. (at 307) held that a union could fulfill its obligation in regard to the required financial disclosure by calculating its fee on the basis of its expenses during the preceding year.

*Unions may not compel a public employee to finance a union's ideological activities*

52. In *Abood* v. *Detroit Board of Education*, 431 U.S. 209 (1977) and *Lehnert* v. *Ferris Faculty Association*, 500 U.S. 507 (1991), the Court held that compelling a public employee to finance a union's ideological activities unrelated to collective bargaining would violate the First and Fourteenth Amendments. (*Abood* 431 U.S., at 235 - 237; and *Lehnert* 500 U.S., at 517).

*Certain union activities may not constitutionally be supported through objecting employees' funds*

53. In *Lehnert* 500 U.S. 507, the Court defined specific union activities that may *not* constitutionally be supported through objecting employees' funds. These include:

a) " lobbying activities that do not concern legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement" (500 U.S. at 519);

b) " legislative lobbying, electoral, or other union political activities outside the limited context of contract ratification or implementation." (500 U.S. at 522) (Lobbying for financial support of the employee's profession or of public employees generally is cited as an example of a proscribed activity. [500 U.S. at 520]);

12

c) union programs designed to secure funds for public education (500 U.S. at 527);

d) litigation that does not concern petitioners' bargaining unit and, by extension, union literature reporting on such litigation (500 U.S. at 528);

e) public relations efforts designed to enhance the reputation of the teaching profession and covering information picketing, media exposure, signs, posters, and buttons (500 U.S. at 528).

## *Unions are under a duty of fair representation to all employees in the unit*

54. *Abood* 431 U.S. (at 223-224) held that a public sector union that is designated as an exclusive representative of employees is under a duty of fair representation to all employees in the unit, whether or not union members.

55. *Vaca* v. *Sipes* 386 U.S. 171 (1967) indicates that a union's duty of fair representation requires it "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct" (*Vaca* v. *Sipes* 386 U.S., at 177).

## *Unions may not obtain an involuntary loan for purposes to which the employee objects*

56. *Hudson* 475 U.S. (at 305) indicates that it is impermissible even *to risk* the possibility that fee payers' contributions may be temporarily used for impermissible purposes.

57. *Ellis* v. *Railway Clerks* 466 U.S. 435 holds that a union does not completely undo a constitutional violation when, after using a portion of agency fees for ideological purposes, it refunds with interest that portion of the fee to an objector: "Even then the union obtains an involuntary loan for purposes to which the employee objects" (*Ellis* 466 U.S., at 444).

## *Unions must provide a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decision maker*

58. *Hudson* 475 U.S. (at 310) holds "that the constitutional requirements for the

Union's collections of agency fees include... a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decisionmaker..."

59. Tierney v. City of Toledo, 824 F.2d 1497, 1507 (6th Cir. 1987) holds that a one-year delay in arbitration does not constitute a "reasonably prompt" opportunity to challenge the amount of the agency fee as required in *Hudson* 475 U.S. (at 310).

***The only burden a fee payer has in seeking an arbitration hearing is to register an objection with the union***

60. *Hudson* 475 U.S. (at 307) indicates that, "The nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner."

61. *Hudson* 475 U.S. (at 306) indicates that the union, not the objector, bears the burden of proving the proportion of the agency fee that is spent for ideological purposes: "The nonmember's 'burden' is simply the obligation to make his objection known" *Hudson* 475 U.S. at 306, note 16).

***Once an objection is registered, unions must promptly cease using an objector's fee for political purposes***

62. In *Machinists* v. *Street*, 367 U.S. 740 (1961) and *Abood* 431 U.S. 209, the Court found that once objectors made it known to the union of their objection to the use of their money for the support of political causes, the union was "without power to use payments thereafter tendered" by such objectors for those political causes. (*Street*, 367 U.S., at 771; *Abood* 431 U.S., at 238)

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

***A union policy which requires fee payers to object in order to receive a financial report***

63. Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth

14

hereat.

64. Hudson 475 U.S. (at 306) holds that "Leaving the nonunion employees in the dark about the source of the figure for the agency fee -- and requiring them to object in order to receive information..." does not adequately protect the First Amendment rights of nonunion employees.

65. The PSC policy that requires an agency fee payer to register an objection to ideological expenditures by the union in order to receive information about the union's expenditures (See Exhibit 1, paragraph 5) abridges and will abridge the fee payer's First and Fourteenth Amendment rights as defined in Hudson 475 U.S., at 306.

**SECOND CLAIM FOR RELIEF:**

*Failure to provide plaintiff with any financial reports for f.y. 2001/02 and 2002/03*

66. Plaintiff repeats and realleges paragraphs 1 through 65 as if fully set forth hereat.

67. The PSC's failure to provide the plaintiff, who became a fee payer effective May 7, 1999, with any information about PSC expenditures for the fiscal years 2001-2002 and 2002-2003 abridges and will abridge his First and Fourteenth Amendment rights as defined in Hudson 475 U.S., at 306.

**THIRD CLAIM FOR RELIEF:**

*Financial disclosure that is inadequate under the standards defined in Hudson*

68. Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth hereat.

69. *Hudson* indicates that the union bears the burden of "proving"; "showing"; giving "an explanation"; and including "reasons" why its calculation of the nonmembers' share of chargeable expenses is justified (Hudson 475 U.S., at 306).

70. Under the Revised Procedure, the PSC does not disclose its finances to all

15

nonmembers: it provides financial reports only to those nonmembers who register objections. (See Exhibit 1)

71. Under the Revised Procedure, the PSC provides an explanation of the advanced reduction of the agency fee to objectors at the beginning of the new fiscal year. (See Exhibit 1, paragraph 5).

72. Under the Revised Procedure, the PSC will calculate an objector's advance reduction of the agency fee based on "the latest fiscal year's information for which there is a completed and available audited financial statement." (See Exhibit 1, paragraph 5)

73. Under its revised procedures, the PSC will use the Report to Objectors-FY 00/01 to calculate an objector's advance reduction for the fiscal year 2002-2003 because the former is the most recent audited statement that the PSC has made available to agency fee objectors.

74. The financial report that the PSC provides and will provide to objectors (and that it should, but does not, provide to all nonmembers) is inadequate according to the standards for financial disclosure defined in *Hudson* 475 U.S., at 306-307: the expense categories listed are so few in number, so broadly defined, and so poorly explained (see Exhibit 2) that it is impossible to judge whether the listed expenses are related or unrelated to terms and conditions of employment (e.g., "postage and delivery").

75. By providing an inadequate explanation of the basis for the agency fee to objectors, and by failing to provide any explanation to non-objecting fee payers, the PSC fails to provide potential objectors with "sufficient information to gauge the propriety of the union's fee" as required by *Hudson* 475 U.S. (at 306-310) and thereby abridges and will abridge the First and Fourteenth Amendment rights of all fee payers.

**FOURTH CLAIM FOR RELIEF:**

*Compelling objectors to subsidize activities that Lehnert defines as non-chargeable*

76. Plaintiff repeats and realleges paragraphs 1 through 75 as if fully set forth hereat.

77. In the PSC portion of expenditures for the fiscal year 2000/2001, the only expenses that the union identifies as being of a political nature (and therefore non-chargeable to objectors) are its direct contributions to outside political groups, and the costs of reporting on these contributions, a sum of $15,575. (See Exhibit 2)

78. The PSC Report to Delegates-FY 00/01 reveals, however, that the PSC spent far more money on non-chargeable activities in the fiscal year 2000/2001 than the $15,575 that it acknowledges was so spent, as the following demonstrates.

79. Although *Lehnert* specifies as non-chargeable "lobbying activities that do not concern legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement" (500 U.S. at 519); lobbying for financial support of the employee's profession or of public employees generally (500 U.S. at 520); and union programs designed to secure funds for public education (500 U.S. at 527), the PSC compels objectors to subsidize all or part of the following expenses (See Exhibit 3):

a) CUNY Budget Campaign ($34.385-line 55: "Covers costs of activities in Albany and at City hall to increase State and City budgets")

b) Consultants-Lobbying and PR ($135,991-line 53: A portion of this is devoted to the PSC "campaigns for an improved CUNY budget from NYS and NYC.")

c) Conferences, Meetings, Legislation ($188,858-line 48: A portion of this involves the costs of "Albany lobby activities", including, as shown above, activities to influence State and City budgets.)

d) Postage & Deliver ($108,626-line 26: A portion of this is devoted to "legislative

82. In regard to AFT expenditures: although *Lehnert* specifies as non-chargeable "legislative lobbying, electoral, or other union political activities outside the limited context of contract ratification or implementation." (500 U.S. at 522), the AFT compels objectors to subsidize the following (See Exhibit 5):

    a) expenditures for media services "used to explain the Federation's positions in educational reform on such issues as educational changes in the profession, class size, modern methods of teaching and school structure, financial improvements, educational accountability issues, and educational restructuring of schools";

    b) expenditures for "communications with community organizations, civic groups, government agencies, and the media regarding the Federation's position on work-related matters."

    c) the costs of articles dealing with "class size and educational reform issues on new and advanced methods of classroom instruction."

83. In regard to NYSUT expenditures: although *Lehnert* specifies as non-chargeable "legislative lobbying, electoral, or other union political activities outside the limited context of contract ratification or implementation." (500 U.S. at 522), the NYSUT compels objectors to subsidize all "Legislative Action" expenses with the exception of expenses for political education of its membership. (See Exhibit 4)

84. The NYSUT defines voter registration as non-chargeable to objectors.

85. By compelling objectors to finance ideological activities unrelated to collective bargaining and contract administration, the PSC, AFT, and NYSUT violate objectors' First and Fourteenth Amendments, as defined in *Abood* 431 U.S. 209 and *Lehnert* 500 U.S. 507.

**FIFTH CLAIM FOR RELIEF:**

*The PSC failed to exhibit the requisite good faith in protecting rights of nonmembers*

86. Plaintiff repeats and realleges paragraphs 1 through 85 as if fully set forth hereat.

19

87. As a public sector union that is designated as an exclusive representative of employees, the PSC is under a duty of fair representation (*Abood* 431 U.S., at 223-224) and is therefore required to exhibit "complete good faith and honesty, and to avoid arbitrary conduct" (*Vaca* v. *Sipes* 386 U.S., at 177).

88. The PSC acts arbitrarily when it designates voter registration as a *work-related* expense to be charged to objectors (Exhibit 3), in spite of the fact that the NYSUT acknowledges *in the same financial report* that voter registration is *unrelated to work* and therefore is not to be charged to objectors (Exhibit 4).

89. The PSC breached its obligation to act in complete good faith when it ignored for 16 years the mandate in *Hudson* 475 U.S. 292 (1986) to provide objectors with an opportunity for prompt arbitration.

90 The PSC breached its obligation to act in complete good faith when it ignored for 16 years the mandate in *Hudson* 475 U.S. 292 (1986) to provide *all* agency fee payers with financial information regarding the basis for the fee.

91. The PSC *continues to breach* its obligation to act in complete good faith when, in the revision of its procedures prompted by this case, it willfully ignores the mandate in *Hudson* 475 U.S. 292 (1986) to provide *all* agency fee payers with financial information. (It still supplies the requisite financial information only to objecting fee payers.)

92. The PSC breaches its obligation to act in complete good faith when it sends objectors a financial report so lacking in detail that it is impossible to judge whether the listed expenses are ideological or not (e.g., "postage and delivery"). (In contrast, it supplies union delegates with an accounting of its expenditures containing detail sufficient to determine whether some—but not all— of the listed activities are ideological or work-related; Compare Exhibit 2 and Exhibit 3)

93. The PSC breaches its obligation to act in complete good faith when, using the cover of inadequate financial disclosure, it designates as work-related (and chargeable) expenses which cannot rationally be designated as work-related (e.g., voter registration) or that have been explicitly defined as unrelated to work by the court (e.g., "lobbying activities that do not concern legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement"; *Lehnert* 500 U.S. at 519). (Compare Exhibit 2 and Exhibit 3)

94. By failing to provide non-objecting agency fee payers with financial information regarding the basis for the fee, the PSC not only breaches its obligation to act in complete good faith, it robs fee payers of an opportunity to make an informed decision on whether to exercise their option to object to ideological expenditures by the union.

94. By providing objectors with an inadequate and misleading account of its expenses, the PSC not only breaches its obligation to act in complete good faith, it robs objectors of an opportunity to make an informed decision on whether to exercise their option to ask for a hearing before an impartial arbiter.

95. The failure of the PSC to make a good faith effort to inform nonmembers about its finances breaches its duty of fair representation under *Vaca* 386 U.S. (at 177), and abridges and will abridge nonmembers' First and Fourteenth Amendment rights as defined in Hudson 475 U.S., at 306-310.

## SIXTH CLAIM FOR RELIEF:

### *An impermissible barrier to arbitration*

95. Plaintiff repeats and realleges paragraphs 1 through 94 as if fully set forth hereat.

96. *Hudson* 475 U.S. (at 306-307) indicates that an objector by simply making his objection known (at 306, note 16) is entitled to have "his objections addressed in an expeditious, fair, and objective manner" (at 307).

97. Under the Revised Procedure of the PSC, in order to gain the opportunity to challenge the amount of the agency fee before an arbitrator, an objector "must indicate to the union local president the percent of agency fees that s/he believes is in dispute." (See Exhibit 1, paragraphs 6 and 9)

98. PSC procedures that make arbitration conditional on an objector's identification of the percent of agency fees in dispute places a burden on objectors that goes beyond that allowed under *Hudson* 475 U.S. (at 306-307), and thereby abridges and will abridge their First and Fourteenth Amendment.

## SEVENTH CLAIM FOR RELIEF:

### *An involuntary loan for purposes to which the plaintiff objects*

99. Plaintiff repeats and realleges paragraphs 1 through 98 as if fully set forth hereat.

100. *Hudson* 475 U.S., at 305 indicates that it is impermissible even *to risk* the possibility that fee payers' contributions may be temporarily used for impermissible purposes.

101. *Ellis* v 466 U.S. (at 444) holds that a union does not completely undo a constitutional violation when, after using a portion of agency fees for ideological purposes, it refunds with interest that portion of the fee to an objector: "Even then the union obtains an involuntary loan for purposes to which the employee objects."

102. Through an error on the part of the PSC, none of the plaintiff's agency fee for the 1999-2000 fiscal year was held in escrow, and therefore the entire fee was available for three years for the unfettered use by the PSC.

103. Although the union returned to the plaintiff an amount of money representing his agency fee payment for the fiscal year 1999-2000, plus interest at the legal rate, it still caused the plaintiff constitutional harm (as per *Ellis* v 466 U.S., at 444) because it had

obtained an involuntary loan for ideological purposes to which he objects.

104. On September 10, 2002, the PSC returned to the plaintiff an amount of money representing the portion ($59.14) of his agency fee payment that the PSC alleges was spent for ideological purposes for the fiscal year 2000-2001, plus interest at the legal rate.

105. After the plaintiff disputed the validity of the PSC calculation of his fee for 2000-2001, the PSC returned to the plaintiff, without interest, an amount of money representing the portion of his agency fee payment that the PSC alleges was *not* spent for ideological purposes ($637.52).

106. Because a portion of the agency fee for the 2000-2001 fiscal year was, despite PSC assertions to the contrary, spent on non-chargeable activities (such as voter registration), the PSC caused the plaintiff (a) constitutional harm (as per *Ellis* v 466 U.S., at 444) because it had obtained from him an involuntary loan for ideological purposes to which he objects and (b) financial harm because it did not pay interest on the portion of the agency fee that it improperly spent on ideological activities.

**EIGHTH CLAIM FOR RELIEF:**

*The added burden of an annual renewal of objections*

107. Plaintiff repeats and realleges paragraphs 1 through 106 as if fully set forth hereat.

108. The PSC requirement that objections to ideological expenditures be renewed annually runs counter to the *Hudson* (475 U.S., at 303) mandate that procedures be carefully tailored to minimize constitutional infringements: the only burden that fee payers bear is to object (*Hudson* 475 U.S. at 306, note 16), not to *repeatedly* object. (see *Shea* v. *International Association of Machinists & Aerospace Workers*, 154 F.3d 508; 1998; at 515)

## DEMAND FOR RELIEF

**WHEREFORE**, plaintiff asks that the Court render Judgment:

1. compelling the PSC to abandon its policy that requires agency fee payers to register an objection to ideological expenditures in order to receive information about the union's finances;

2. compelling the PSC to provide immediately all agency fee payers with "sufficient information to gauge the propriety of the union's fee" (as per standards defined in *Hudson* 475 U.S., at 306-310, and *Lehnert* 500 U.S., at 519 – 528) for the 2000-2001, 2001-2002, and 2002-2003 fiscal years, as well as on a yearly basis for all future fiscal years;

3. compelling the PSC to provide all agency fee payers with an opportunity to register their objections to ideological expenditures made by the PSC from September 2000 to the present (i.e., made in the 2000-2001 and 2001-2002 fiscal years, and planned for the 2002-2003 fiscal year), as compensation for its failure over the past 16 years to follow the constitutional mandate of *Hudson* 475 U.S. (at 310) to provide fee payers with "an adequate explanation of the basis for the fee;"

4. compelling the PSC to permit all agency fee payers who register objections to fee calculations for the 2000-2001 and 2001-2002 fiscal years, and to those planned for the 2002-2003 fiscal year, with a prompt opportunity to challenge those calculations before an impartial arbiter;

5. compelling the PSC to immediately increase — in accord with the accurate application of standards in *Lehnert* 500 U.S. (at 519 – 528) — the size of the escrow or advanced reduction of fees that the PSC uses to prevent the spending of objectors' fees for ideological purposes;

6. compelling the PSC to abandon its policy that makes arbitration over agency fee disputes conditional on an objector's identification of the percent of agency fees in dispute;

7. compelling the PSC to abandon the policy requiring that objections to ideological expenditures be renewed annually;

8. compelling the PSC to return to the plaintiff an interest payment on the portion of his agency fee for the fiscal year 2000-2001 that it claimed was used for work-related expenses, but which in fact was used for non-chargeable expenses such as voter registration;

9. compelling the PSC to financially compensate the plaintiff for the damage he suffered to his constitutional rights ( as per *Ellis* 466 U.S., at 444) when the PSC obtained from him an involuntary loan for purposes to which he objects in the fiscal years 1999-2000 and 2000-2001;

10. compelling the PSC to financially compensate the plaintiff for the damage he suffered to his constitutional rights when the PSC unlawfully deprived him of his right to a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decision maker;

11. compelling the PSC to pay punitive damages to agency fee payers because it failed to make a good faith effort to inform fee payers about its finances a) when it willfully ignored for 16 years the mandate in *Hudson*, 475 U.S. 292 for financial disclosure to fee payers and b) when it sent to objectors an insufficient and inaccurate account of expenses, and thereby willfully ignored for 11 years the standards for allowable charges specified in *Lehnert* 500 U.S. 507;

12. awarding the plaintiff the costs of this action;

13. granting such other, further, or different relief as this Court deems appropriate.

Dated: North Haven, Connecticut
   January 13, 2003

         *David Seidemann*

        David Seidemann
        38 Garfield Avenue
        North Haven, Connecticut 06473
        (203) 281-6631 (home telephone)
        (718) 951-5425 (work telephone)

        At North Haven, CT
        Subscribed and Sworn to before me this

        13 day of JAN 2003
        *Linda K Bejkowski*
25         Notary Public
        My Commission Expires June 30, 2004

**EXHIBIT 1**

(Proposed Revised) AGENCY FEE REFUND PROCEDURE

New York State Civil Service Law, Chapter 606, Laws of 1992, was amended to provide for mandatory agency fee deductions. In accordance with the amendment, your local, the Professional Staff Congress/CUNY, will be making agency fee deductions in an amount equivalent to union dues, as provided in this procedure.

Pursuant to Chapter 677, Laws of 1977, (as amended by Chapter 678, Laws of 1977 and Chapter 122, Laws of 1978), any person making agency fee payments to the union has the right to object to the expenditure of any part of the agency fee that represents that employee's *pro rata* share of expenditures by the union and its affiliates in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment.

Such an objection, if any, shall be made by the the payor ("the objector") individually notifying the union local's president of her/his objection only during the period between May 1st and May 31st of the year prior to the beginning of the fiscal year to which the objection pertains. The union's fiscal year commences on September 1st. No deduction will be taken until after the above-stated objection period has closed.

For those CUNY employees making agency fee payments to the Union in the full semester of the fiscal year for which the refund is being sought *but who were not employed by CUNY during the month of May prior to the fiscal year at issue*, there shall be a re-opening period – between November 1 and 30 – during which they may file objections in the same manner as above.

If such objection is made, the objector's agency fee for the next fiscal year will be reduced by the projected *pro rata* amount of expenditures for such political and ideological purposes based on the latest fiscal year's information for which there is a completed and available audited financial statement. The objector will be provided at the beginning of the new fiscal year with an advance payment equal to the amount of the reduction, together with an explanation as to how such a projected amount was calculated.

If the objector is dissatisfied with the amount or appropriateness of the advance reduced amount, s/he may appeal that determination in writing and send it to the union local's president by U.S. Mail within thirty-five (35) calendar days following the union's mailing of the advanced payment amount. At that time the objector must indicate to the union local president the percent of agency fees that s/he believes is in dispute. The question of the adequacy of the advance payment thereafter will be submitted by the union to a neutral party appointed by the American Arbitration Association for an expeditious hearing and resolution in accordance with its rules for agency fee determinations. The costs for any appeal to a neutral party under this procedure shall be borne by the union.

-continued-

The union, at its option, may consolidate all appeals and have them resolved at one proceeding held for this purpose. The objector may present her/his appeal in person or in writing.

As soon as they are available after the close of the union's fiscal year, the union will provide copies of the audited financial statements to the objector, including the final refund determination for the fiscal year at issue.

If the objector is dissatisfied with the amount or appropriateness of the amount of the final determination, s/he may appeal that determination in writing and send it to the union local's president by U.S. Mail within thirty-five (35) calendar days following the union's mailing of the advice regarding the amount of the final determination. At that time the objector must indicate to the union local president the percent of agency fees that s/he believes is in dispute. The question of the adequacy of the amount of the final determination thereafter will be submitted by the union to a neutral party appointed by the American Arbitration Association for an expeditious hearing and resolution in accordance with its rules for agency fee determinations. The costs for any appeal to a neutral party under this procedure shall be borne by the union.

# EXHIBIT 2

(page 1 of 2)

2.

**EXHIBIT B**

## PROFESSIONAL STAFF CONGRESS/CUNY

### STATEMENT OF ACTIVITIES

### YEAR ENDED AUGUST 31, 2001

| | |
|---|---:|
| **Revenues** | |
| Membership dues and fees | $ 6,078,689 |
| Subsidies from affiliate - New York State United Teachers | 630,147 |
| Interest income | 239,481 |
| Rental income (Note 4) | 197,104 |
| Total revenues | 7,145,421 |
| | |
| **Expenses** | |
| Salaries | 1,511,691 |
| Fringe benefits | 397,923 |
| Depreciation and amortization | 28,577 |
| Dues to affiliated organizations | 2,900,278 |
| Conferences and meetings | 175,441 |
| Occupancy (Note 4) | 544,114 |
| Repairs and maintenance | 96,460 |
| Office supplies, printing and publishing | 216,963 |
| Postage and delivery | 108,520 |
| Professional fees | 396,186 |
| Insurance | 11,634 |
| Other expenses | 83,747 |
| Total expenses (Note 7) | 6,471,534 |
| | |
| Change in unrestricted net assets (Exhibit C) | 673,887 |
| | |
| Net assets - beginning of year | 3,883,033 |
| | |
| Net assets - end of year (Exhibit A) | $ 4,556,920 |

See independent auditor's report.

The accompanying notes are an integral part of these statements.

---

## PROFESSIONAL STAFF CONGRESS/CUNY

### NOTES TO FINANCIAL STATEMENTS

### AUGUST 31, 2001

**NOTE 4 - LEASE**

PSC/CUNY rents space for its administrative office. The rent is pursuant to a lease that expires on September 30, 2006. The lease includes provisions for escalations and utility charges.

Rent expense for the year ended August 31, 2001 was $443,624.

Minimum payments required under the lease is as follows:

| | |
|---|---|
| 2002 | $ 444,608 |
| 2003 | 447,168 |
| 2004 | 447,168 |
| 2005 | 447,168 |
| 2006 | 447,168 |

PSC/CUNY rents out a portion of its premises to an affiliated organization. Total rental income for the year was $197,104.

**NOTE 5 - PENSION PLAN**

Clerical and support staff are covered by a qualified pension and annuity plan administered by the union. For the year ended August 31, 2001, the contributions to these plans amounted to $39,870.

The following table summarizes the benefit obligations, fair value of assets, funded status and accrued benefit costs as of August 31, 2001 and employer contributions, benefits paid and net periodic pension costs for the year then ended:

| | |
|---|---:|
| Benefit obligation | $(884,932) |
| Fair value of plan assets | 1,166,571 |
| | |
| Funded status | $ 277,639 |
| | |
| Prepaid pension benefit cost recognized in the balance sheet | $ 225,501 |
| | |
| Benefits paid | $ 220,172 |
| | |
| Net periodic pension cost | $ 58,010 |
| | |
| Weighted average assumptions as of August 31, 2001: | |
| Discount rate | 6.5% |
| Expected return on plan assets | 7.0% |
| Rate of compensation increase | 4.0% |

-continued-

LOEB & TROPER

**EXHIBIT 2**

(page 2 of 2)

## I. REBATABLE CLARION EXPENDITURES for FISCAL YEAR 2000-01

1. Rebatable column inches / Total column inches

$$\frac{3.25}{2,826.00} = 0.035646$$

Percent rebatable = 3.56%

2. Rebatable production costs / Actual Clarion expenditures

$67,499 X 3.56% = $2,403

3. Rebatable salary costs / Editor's salary

$40,149 X 3.56% = $1,429

4. Total Rebatable Amount for Clarion = $2,403 + 1,429 = $3,812

## II. TOTAL REFUNDABLE EXPENSES for FISCAL YEAR 2000-02

| | |
|---|---|
| Political or Ideological Expenses | $11,575 |
| Clarion | 3,812 |
| Total | $15,387 |

## III. COMPUTATION OF PSC PORTION for FISCAL YEAR 2000-01

Rebatable expenses / Total PSC expenses (from audit)

$$\frac{15,387}{6,471,534} = 0.0023$$

$698.66 (amount of annual union agency fee)
X .0023 : PSC Portion
$1.60

## IV. TOTAL pro rata AGENCY FEE REFUND for FISCAL YEAR 2000-01

| | |
|---|---|
| PSC | $1.60 |
| AFT & NYSUT | $55.56 |
| Subtotal | $57.16 |
| Plus interest earned in escrow account | 1.98 |
| TOTAL | $59.14 |

● Page 2

---

PSC Expenditures of a Political or Ideological Nature Only Incidentally Related to Terms and Conditions of Employment

Fiscal Year 2000-2001

(Charged to Advertising and Public Relations Expenses in the PSC Financial Audit, enclosed)

| DATE | EVENT/ORGANIZATION | AMOUNT |
|---|---|---|
| Sept '00 | NYS Labor Religion Coalition | $ 180.00 |
| | ACLU | 100.00 |
| Oct '00 | NY Labor History Association | 150.00 |
| | People's Weekly World | 90.00 |
| | Jewish Labor Committee | 550.00 |
| | Hispanic Labor Committee | 450.00 |
| | United Farm Workers | 100.00 |
| Nov '00 | Gay Men's Health Crisis (GMHC) | 100.00 |
| | Jews for Racial & Economic Justice | 265.00 |
| | The Working Theatre | 400.00 |
| | Citizen Action Of NY | 500.00 |
| | Italian American Labor Council (IALC) | 300.00 |
| | Scholars, Artists & Writers for Social Justice | 750.00 |
| Dec '00 | | 00.00 |
| Jan '01 | The Joseph Baskin Culture Fund | 600.00 |
| | Italian American Labor Council (IALC) | 200.00 |
| Feb '01 | National Lawyer Guild-NYC Chapter | 250.00 |
| | NY Labor History Association | 250.00 |
| Mar '01 | Coalition of Unions in Public Education | 500.00 |
| Apr '01 | Jewish Labor Committee | 250.00 |
| | Campaign for a Better Greenwich Village | 500.00 |
| | UFT Scholarship Fund | 1050.00 |
| | NY Institute for Social Justice | 500.00 |
| | Gay Men's Health Crisis (GMHC) | 125.00 |
| | American Assoc. Of Univ. Women (AAUW) | 40.00 |
| May '01 | Jobs With Justice | 1150.00 |
| | Metro NY Health Care for All Campaign | 375.00 |
| Jun '01 | The Democratic Assembly | 1000.00 |
| Jul '01 | Human SERVE | 250.00 |
| Aug '01 | Nat'l Action network | 500.00 |
| | Women's International's League for Peace & Freedom | 100.00 |
| | Total: | $11,575.00 |

1

# EXHIBIT 3

(page 1 of 4)

DRAFT

## Professional Staff Congress
## Proposed Budget 2001 - 2002

10/20/01

| INCOME: | Annual Budget 00-01 | Actual 12 Months 00-01 | Projected Budget 01-02 |
|---|---|---|---|
| 1. Release and Associates | 191,837 | 199,903 | 109,903 |
| 2. Sr. & Comm.Gold.Dues Fees | 5,480,654 | 5,778,975 | 6,580,000 |
| 3. ESO & Research Foundation | 92,484 | 92,658 | 90,000 |
| Total Dues and Fees | 8,728,728 | 6,091,187 | 6,766,966 |
|  |  |  |  |
| NYSUT Reimbursement: |  |  |  |
| 4. Main Funding | 830,147 | 630,279 | 615,867 |
| 5. NYC Admin. P/R Fees | 7,775 | 1,307 | 1,900 |
| 6. AAUP & GBC Cost & DA Mgr. | 7,775 | 7,775 | 8,000 |
| 7. Legislative Representation | 12,960 | 12,960 | 10,000 |
| 8. Salary & Health Costs | 10,301 | 10,301 | 10,000 |
| 9. Teachers Retirement Council | 11,620 | 11,620 | 12,000 |
| 10. Grievance Training | 22,698 | 22,638 | 25,000 |
| 11. Arbitration Filing Fees | 713 | 713 | 1,000 |
| 12. Organizing | 0 | 0 | 50,000 |
| 13. Consultation - PR | 0 | 0 | 30,000 |
| 14. AAUP Dues | 41,000 | 41,000 | 43,013 |
| Total NYSUT Reimbursements | 738,879 | 738,911 | 806,210 |
|  |  |  |  |
| 15. AFT rebate. on AAUP dues | 41,000 | 41,000 | 43,013 |
| 16. Interest Income | 220,000 | 296,185 | 296,000 |
| 17. Rental Income | 132,500 | 137,131 | 125,000 |
| 18. Credit Union | 62,338 | 56,973 | 73,000 |
| 19. Voter Reg.'01 | 3,701 | 19,328 | 3,681 |
| Other Income | 466,339 | 807,867 | 481,948 |
|  |  |  |  |
| TOTAL INCOME | 8,968,763 | 7,707,386 | 8,068,778 |

| EXPENDITURES | Annual Budget | Actual 12 Months | Projected Budget |
|---|---|---|---|
| 1. Dues to Affiliates: |  |  |  |
| 20. NYSUT | 1,800,095 | 1,894,306 | 2,223,410 |
| 21. AFT | 1,014,782 | 1,066,481 | 1,367,987 |
| 22. AAUP & GBC | 125,000 | 141,195 | 140,790 |
| 23. NYS Public Higher Educ. | 0 | 0 | 2,400 |
| 24. MLC | 12,000 | 13,231 | 13,000 |
| Total Dues to Affiliated | 2,964,585 | 3,115,875 | 3,775,887 |
|  |  |  |  |
| 2. Union Operations |  |  |  |
| 25. Rent & Electricity | 637,413 | 644,114 | 880,000 |
| 26. Postage & Delivery | 85,000 | 108,898 | 100,000 |
| 27. Computer Equipment & Services | 60,000 | 67,538 | 150,000 |
| 28. Office Supplies & Printing | 60,000 | 69,334 | 73,000 |
| 29. Telephone | 30,000 | 19,878 | 21,180 |
| 30. Machine Rental/Leasing | 30,000 | 14,278 | 14,278 |
| 31. Machine Maintenance | 12,000 | 12,000 | 12,000 |
| 32. Accounting & Auditing | 20,000 | 18,300 | 18,000 |
| 33. Dues, Fees Refunds | 17,500 | 12,882 | 18,000 |
| 34. Office, Furniture & Equipment | 10,000 | 3,980 | 8,000 |
| 35. Library Acquisition | 10,000 | 7,330 | 8,000 |
| 36. Insurance & Bonds | 12,500 | 11,634 | 11,534 |
| 37. Elections | 20,000 | 4,949 | 15,000 |
|  |  |  |  |
| 3. Personnel and Related |  |  |  |
| 38. Salaries - Professional Staff | 748,002 | 662,911 | 902,273 |
| 39. Salaries - Support Staff | 549,342 | 498,238 | 428,474 |
| 40. Fringe Benefits | 302,982 | 228,618 | 338,183 |
| 41. Personnel Cost Reserve | 72,000 | 72,000 | 72,000 |
| 42. Payroll Taxes | 103,071 | 100,743 | 109,472 |
| 43. Reassigned Time & Stipends | 348,101 | 364,304 | 382,000 |
| 44. Tonya | 18,000 | 11,058 | 10,000 |
|  |  |  |  |
| 4. Mobilization & Outreach |  |  |  |
| 45. Public Relations-Barucks | 28,000 | 23,302 | 23,362 |
| 46. Clarion | 74,500 | 67,439 | 120,972 |
| 47. Chapter Budgets | 207,778 | 188,856 | 96,000 |
| 48. Conference, Meetings, Legislation | 30,000 | 33,325 | 180,000 |
| 49. Bella Zeller Scholarship Fund | 0 | 0 | 10,000 |
| 50. Bella Zeller Professorship | 20,000 | 0 | 50,000 |
| 51. Organizing | 20,000 | 4,858 | 10,000 |
| 52. Cultural Activities | 60,000 | 135,991 | 180,000 |
| 53. Consultants Lobbying & PR | 100,000 | 28,501 | 50,000 |
| 54. Contract Campaign | 60,000 | 34,385 | 50,000 |
| 55. CUNY Budget Campaign | 18,500 | 18,730 | 50,000 |
| 56. Voter Reg.'01 | 10,000 | 4,385 | 2,850 |
| 57. Committees | 28,000 | 329 | 20,000 |
| 58. Solidarity | 0 | 16,667 | 15,000 |
| 59. Health & Safety | 0 | 0 | 15,000 |
| 60. HEO Chapter Organizing | 0 | 0 | 15,000 |
| 6. Contract Enforcement & Related Costs |  |  |  |
| 61. Grievance, Arbitration & Legal Services | 85,573 | 14,088 | 30,000 |
| 62. Legal Consultants | 76,000 | 80,057 | 100,000 |
| 6. Other | 20,000 | 20,000 | 20,000 |
| 63. Contingencies | 100,448 | 611,970 | 0 |
| 64. Addition to Reserves | 0 | 0 | 0 |
| Total | 8,921,343 | 7,887,857 | 8,868,778 |

# EXHIBIT 3

(page 2 of 4)

12/20/01

## Draft Proposal for the PSC Budget, 2001-2002

I present to you a draft of the balanced budget for the fiscal year, Sept. 1, 2001 to August 31, 2002. The Finance Committee and PSC officers and staff have worked long and hard to produce a budget that expresses and supports the politics of the union, its vision and direction. Overall, the purpose is to develop the power of the union to advance the interests of the members and the people we serve.

The budget has a somewhat different look as we work towards a clearer picture of the sources and uses of our money. We have dropped the "cents" column and rounded off to the nearest dollar. We have numbered each item to facilitate identifying the items for discussion. We have begun to group various activities or functions in several broad categories to the relationship of different parts of the budget.

Budgets involve estimates of expected income and expenses and include a number of assumption. In this budget we used a conservative estimate of a collective bargaining agreement going back to the expiration of the last contract (August 31, 2000). This is not a prediction or indication of ongoing collective bargaining but a prudent working assumption.

Important new or changing items in this budget which reflect our movement towards a more activist and participating union of broad and deep membership involvement – for this is where our power lies – are:

- Chapter Budgets which allow and encourage chapters to plan and carry out more local membership education and action
- Improved communication with members through Clarion, redesign and new features to make it more attractive and reader-friendly
- Continued resources for organizing and committee work on issues important for union strength
- Increased resources for legislative/lobbying activity to advance the PSC presence in Albany and City Hall
- Increased resources for public relations work to create a more favorable public awareness of the PSC and CUNY, to build public understanding of and support for our issues
- Continued support for the legal branch of our strategy, to maximize our legal means of addressing key issues
- Continued support for the cultural discussion of our agenda, to go along with our economic and political programs, to build a union culture within our own membership and to build relationship with other unions and potential allies

After hearing your comments tonight, a final version of this budget will be presented to the Executive Council for approval on January 10, 2002, and to the Delegate Assembly for approval on January 31, 2002.

---

As we have noted at previous meetings, we are in negotiations with our state and national affiliates, NYSUT and AFT, regarding dues payments and reimbursement. These negotiations will affect the budget. What we are presenting now is a conservative version, which we think can improve through our discussion.

Both our income and our expenses have increased. Our income grows with our membership and the implementation of agency fee for part-timers. Our expenses grow due to inflation, contractual increases for professional and support staff, increased activity and specific campaigns, and increased per capita payments to our affiliates.

### NOTES:

**A.    Income**

1.  Retirees pay $71 annually. There are approximately 2,100 retired members.

    Associate members are individuals who either no longer work for CUNY or who were members but are now in exempt titles; they pay $81 annually (Full-Time) or $20 per semester (P/T) in order to sustain NYSUT insurance programs that they participate in (e.g. auto, home, legal service). There are currently 68 Associates members. They do not vote in elections.

2.  Senior and Community College Dues and Fees: Full-Timers pay 1.05% of gross annual income; Part-Timers pay 1% of gross annual income.

3.  EOC:  Educational Opportunity Centers in Brooklyn, Manhattan, Bronx, and Queens are funded by the State but on a different payroll from the Senior Colleges.
    RF:  Research Foundation workers/members have their dues/fees paid on a quarterly basis by the RF itself; we expect less in dues/fees than the past because their salaries are generally lower.

4-14. NYSUT reimbursements:  We have broken these out in detail in this budget so we have a clearer picture of our relationship with NYSUT.  In the past, with the exception of the Metropolitan Plan, they were not listed as income but were subtracted from various expense items.  The Metropolitan Plan is a formula established by NYSUT reimbursing the PSC, the UFT, UUP, Yonkers, and Syracuse teachers unions for activities that we carry out for ourselves, as distinct from smaller NYSUT locals for whom NYSUT provides most of their services through field staff (e.g. contract negotiations, grievances).  The other NYSUT reimbursements are items that have evolved over the years.

15.  AFT reimbursement – AFT pays 1/3 of our AAUP dues (NYSUT pays 1/3 and we pay 1/3).

16.  Interest income: Most of our income is in a money market/checking account with the Bank of New York. We anticipate less income this year because interest rates

# EXHIBIT 3
(page 3 of 4)

17. Rental Income: The PSC rents the fifth floor and some additional space on the sixth floor (printing-mail room). The Welfare Fund pay us their share. We anticipate rental income being less this year because we no longer rent space to HRC, the company that offers financial management services.

18. Credit Union: The Credit Union reimburses us for rent of their space and for a portion of the salaries of our staff who also serve its operations and for a portion of telephone system costs. Our projections are up because we expect to receive back money from the Credit Union for telephone costs.

19. The Voter Registration line indicates a small remainder of a grant.

## B. Expenditures

20. NYSUT dues are $218 annually for members earning above $28,000 a year. They also have four other categories pitched to income levels: three-quarters, one-half, one-quarter, and one-eighth.

21. AFT dues are $131 annually for the members over $28,000 in income. They have two other categories: ¾, ½. They are considering adding a 1/8 category, partly in response to our concerns about the consequences of organizing low-paid part-timers.

22. CBC means Collective Bargaining Conference which is the unit of the AAUP whose colleges have collective bargaining agreements.

23. NYS Public Higher Education Conference – a new organization to promote public higher education, includes PSC, UUP, NEA campuses, Friends of CUNY, UFS and other college senate and community college representatives throughout the state.

24. MLC – Municipal Labor Committee is an organization made up of the unions of NYC public employees. It has bargained for health and welfare benefits for all city employees.

25. Rent and electricity: based on a lease which continues through 2006; it is up because of an increase in the lease terms.

26 & 28. Postage & Delivery and Office Supplies and Printing are projected as higher because of increased membership and organizing and legislative activity.

27. Computer equipment and services: We are still in the process of updating the office and networking the computers that we have, including the cost for new lines and cables that will eventually save us money.

30-31. Machine Rental/Leasing & Maintenance refer to copiers and printing equipment. This category formerly included the leasing of two automobiles, which we have stopped at a savings of $7,200 a year.

32. Accounting & Auditing: We have an accountant for the monthly financial report and another firm for the annual audit.

35. Library Acquisition: We plan to economize in this area and use the money elsewhere on higher priorities.

36. Insurance and Bonds: This covers those officers and staff who are responsible for the finances of the union, and for workers compensation and unemployment insurance.

37. Elections: This amount is projected to be lower, based on what was spent last year on chapter elections.

38. Salaries – Professional Staff: This category is higher because we have key staff for the full year (as compared to last year), because of promotions and contractual increases.

39. Salaries – Support Staff. This category is lower because of restructuring some positions and because some vacancies will be filled several months after the start of the fiscal year.

41. Personnel Cost Reserve: This is money set aside for payment to staff who leave and are owed money for accumulated sick leave and vacation time.

43. Reassigned Time & Stipends: This covers the cost of reassigned time and stipends for chapter chairs, grievance counselors, principal officers and special projects (e.g. Website, Health & Safety).

44. Temps: Refers to cost of occasional hiring of temporary staff to meet emergencies.

45. Public Relations: We buy tickets and newspaper/journal ads for events run by other unions and organizations that can be helpful to our campaigns. It is part of the way we become visible and a participant in labor and NYC/NYS politics.

# EXHIBIT 3

(page 4 of 4)

46. **Clarion:** This item is higher because of increased design costs, including one-time redesign costs, increased printing due to membership growth, and consistent production of a twelve-page issue.

47. **Chapter Budgets** have been allocated to each chapter according to a formula that takes into account basic needs for all and size of chapter membership.

48. **Conferences, Meetings, Legislation:** This category includes the costs of sending delegates to the NYSUT Representative Assembly and the AFT Convention, for Albany lobbying activities, for refreshments for various union meetings. It is down because expenses that previously were included here are broken out elsewhere, e.g. chapter budgets.

49. **Belle Zeller Scholarship Fund:** The PSC contributes up to $20,000 to defray ¼ the cost of the reception for the recipients of the Belle Zeller Scholarships.

50. **Belle Zeller Professorship:** The PSC will contribute up to $10,000 for the Belle Zeller professor at Brooklyn College. This will enable us to influence the choice and activities of the person holding that position (currently Jann Gonzalez).

51. **Organizing:** Refers to expenses involved in our organizing campaign for adjuncts, e.g. materials, refreshments for events (everything but payroll and fringe).

52. **Cultural Activities:** Allocated for cultural events that build the union through education and contacts with other unions and community organizations. (e.g. Labor Film Series).

53. **Consultants:** Lobbying and Public Relations: As part of our campaigns for an improved CUNY budget from NYS and NYC, and for an improved contract, the Executive Council has hired a prominent lobbying firm Bolton-St. John's to represent and assist us in Albany and at City Hall. (Cost: $5,000 per month). We also have a one-year retainer with the PR firm, Sunshine Associates, to boost our media visibility and advance public consciousness of CUNY and PSC issues, especially budget and contract. (Cost: $7,500 per month).

54. **Contract** campaign refers to costs incurred in organizing events in support of contract negotiations (e.g. meetings, rallies).

55. **CUNY Budget Campaign:** Covers costs of activities in Albany and at City Hall to increase the State and City budgets.

56. **Voter Registration 2001:** Refers to the amount left from last year's grant.

57. **Committees:** As committees have multiplied, there is one fund that they can tap into by proposing specific activities with a budget.

58. **Solidarity Activities:** Covers the costs of activities that promote our ties to other unions, community organizations, students (e.g. labor Day Parade, participation in coalitions, meeting with student organizations).

59. **Health and Safety Activities:** This cover the cost of increased activity on campuses, and intern for campus visits, outside environmental testing, and equipment.

60. **HEO Organizing Activities:** This covers the cost of a mobilizing and organizing campaign among HEO's, our largest active chapter, spread out over the whole university.

61. **Grievance, Arbitration and Legal Services:** Refers to the costs of cases that go to arbitration - e.g. filing and room fees, arbitrators' fees, and for related legal materials.

62. **Legal Consultants:** We have a retainer agreement with Arthur Schwartz who assists with contract negotiations and provides legal services in our relations with CUNY (e.g. cases that we take to the Public Employees Relation Board – PERB – such as the Recruitment Retention initiative - RRI - and the Intellectual Property issues, as well as taking CUNY to court over other issues. (Cost: $5,500 per month). We also use Irwin Bluestein of another law firm as counsel in our case with the Research Foundation as we work to establish our right to organize several thousand RF employees. He is paid by the hour.

63. **Contingencies:** Refers to an amount set aside for unexpected or miscellaneous expenses.

64. **Addition to Reserves:** At this point we project ZERO addition. This may change as the year unfolds.

Special thanks to Debbie Bell, Executive Director, Faye Alladin, Coordinator of Financial Services and Diane Rosato, Coordinator of Membership Department; to the Finance Committee – Steve London, Bob8 Weaver, Bob Wurmus, Bob Cermele, Joel Grossman, Linda Percy, Marilyn Neimark, Frank Deale, Jim Cohen, and John Mineka for their contributions to this process.

John Hyland
Treasurer

# EXHIBIT 4
(page 1 of 2)

NEW YORK STATE UNITED TEACHERS AND SUBSIDIARY
Notes to Consolidated Schedule of Expense and Allocation Between
Chargeable and Nonchargeable Expenses
For the Year Ended August 31, 2001

**Note 1 - Significant Accounting Policies**

**Basis of Consolidation**

The consolidated schedule of expenses and allocation between chargeable and nonchargeable expenses include the accounts of New York State United Teachers (NYSUT, Union) and its wholly-owned subsidiary NYSUT Building Corporation. All significant transactions and balances between the entities have been eliminated.

**Depreciation**

Property assets other than automobiles are depreciated by the straight-line method, at rates calculated to amortize the cost of the assets over their respective estimated useful lives.

Automobiles are depreciated by accelerated methods, at rates calculated to amortize the cost of the automobiles over their respective estimated useful lives.

**Note 2 - Definitions**

**(a) Chargeable Expenses**

Chargeable expenses are those incurred by NYSUT which reflect the costs of operations of the Union and those incurred for the purpose of assisting, directly or indirectly, affiliated local unions and their members with respect to terms and conditions of employment.

**(b) Nonchargeable Expenses**

Nonchargeable expenses are those of an ideological or political nature only incidentally related to terms and conditions of employment. Also included as a category of nonchargeable expenses are "members only benefits," or union benefits available only to members.

The term "political" is defined as support of, or opposition to, political parties or candidates for political office and expenses associated with fund raising for such activities. Also included in the definition of "political" are voter registration and political get out the vote efforts. The term "ideological" is defined as support for certain positions that the Union may take which are not work-related or do not have an impact on the terms and conditions of employment of employees represented by the Union or its affiliates.

---

NEW YORK STATE UNITED TEACHERS AND SUBSIDIARY
Notes to Consolidated Schedule of Expenses and Allocation Between
Chargeable and Nonchargeable Expenses (Continued)
For the Year Ended August 31, 2001

**Note 2 - Definitions (Continued)**

**(b) Nonchargeable Expenses (Continued)**

The following are examples of expenses classified as nonchargeable: contributions to political candidates and political parties; fundraising for political candidates, political parties or political action committees; international affairs; activities concerning judicial nominations; endorsements of political candidates; representing NYSUT at fundraising and charitable events; and representing NYSUT in volunteer activities of an ideological nature.

**Note 3 - Significant Factors and Assumptions Used in the Allocation of Expenses Between Chargeable and Nonchargeable**

**(a) Payroll**

Payroll expenses have been allocated to nonchargeable based upon a survey of time spent by all NYSUT personnel on nonchargeable activities for the year ended August 31, 2000.

**(b) Employee Benefits and Payroll Taxes and Provision for Future Cost of Post-retirement Benefits**

These expenses are allocated on the basis of payroll expense allocations described in Note 3(a) above.

**(c) Assistance to Affiliates**

Assistance to affiliates includes reimbursements to local unions for grievances and arbitrations; affiliate support in connection with collective bargaining issues and actions; and direct field support provided to large city locals for collective bargaining and work-related interests of their members. Also included in this category are dues paid to the American Association of University Professors which are determined to be 100% nonchargeable.

**(d) Workshops, Conferences and Leadership Training**

The Organization sponsors numerous workshops and conferences available to members and fee payers which are determined to be 100% chargeable.

# EXHIBIT 4

(page 2 of 2)

**NEW YORK STATE UNITED TEACHERS AND SUBSIDIARY**
Notes to Consolidated Schedule of Expenses and Allocation Between
Chargeable and Nonchargeable Expenses (Continued)
For the Year Ended August 31, 2001

**Note 3 -** **Significant Factors and Assumptions Used in the Allocation of Expenses Between Chargeable and Nonchargeable (Continued)**

(e) New York Teacher - Printing and Mailing

Printing and publishing expenses of the New York Teacher newspaper are allocated based on the specific content of articles. Articles considered political or ideological in nature are determined to be nonchargeable. The nonchargeable expense is calculated based upon the current per column inch advertising rate for NYSUT endorsed vendors. The New York Teacher circulation includes both NYSUT members and agency fee payers.

(f) Legislative Action

Lobbying and legislative activities with respect to work-related issues are determined to be 100% chargeable.

Included in this category are expenses for membership political education such as union sponsored phone banks for voter registration or to get out the vote. These expenses are determined to be 100% nonchargeable.

(g) Contributions and Testimonials

Determined to be 100% nonchargeable.

(h) Supplies and Stationery

Included in this category is the cost of the Union's annual membership card which is determined to be 100% nonchargeable.

(i) Overhead Expenses and Reimbursement of Expenses

The nonchargeable allocations of these expenses and reimbursement of expenses were determined by computing the ratio between nonchargeable personnel expenses to total personnel expenses, the result was applied to the various overhead expenses and reimbursement of expenses.

BUCHBINDER TUNICK & COMPANY LLP