United States District Court
Eastern District of New York _____ X
: 
DAVID SEIDEMANN :
:
       Plaintiff, :
:
:
    -against- : Docket No.
: CV- 02-3389 (SJ) (LB)
: Pro Se
BARBARA BOWEN, personally and in her capacity :
as President of the PSC/CUNY (Professional Staff :
Congress/City University of New York), and PSC/CUNY :
:
      Defendants :
_____ X

RECEIVED MAY 5 2004 PRO SE OFFICE

## PLANTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

    This memorandum of law is respectfully submitted by plaintiff in support of his motion for summary judgment.

### TABLE OF CONTENTS

| | |
|---|---|
| Principle controlling authorities | p. 1 |
| Statement of the issues presented | p. 2 |
| Undisputed material facts | p. 3 |
| Argument | p. 3 |
| Conclusion | p. 25 |
| SJM Exhibit A | following p. 25 |

### PRINCIPAL CONTROLLING AUTHORITIES

CASES:

    *Abood* v. *Detroit Board of Education*, 431 U.S. 209 (1977)

    *Chicago Teachers Union, Local No. 1* v. *Hudson*, 475 U.S. 292 (1986)

    *Ellis* v. *Railway Clerks* 466 U.S. 435 (1984)

    *Hines* v. *Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976)

    *Lehnert* v. *Ferris Faculty Association*, 500 U.S. 507 (1991)

    *Machinists* v. *Street*, 367 U.S. 740 (1961)

    *Vaca* v. *Sipes* 386 U.S. 171 (1967)

1

<u>STATUTES</u>:

42 U.S.C. 1981, et seq.

## STATEMENT OF THE ISSUES PRESENTED

1) Whether the record shows that there is no issue of any material fact and that the plaintiff is entitled as a matter of law to summary judgment because the Professional Staff Congress/City University of New York (hereafter PSC)

a) designates as chargeable to objecting fee payers ideological expenditures by the union that cannot be so charged under the holdings of *Lehnert*;

b) violates its obligation under *Hudson* to give all agency fee payers sufficient information to gauge the propriety of the union's fee;

c) violates its duty under *Vaca* and *Hines* to exhibit complete good faith and honesty of purpose when it creates a willfully deceptive account of expenses in order to hide its flagrant violations of the spending restrictions in *Lehnert*;

d) places a burden on objectors that goes beyond that allowed under *Hudson* when it makes final arbitration over agency fee disputes conditional on an objector's identification of the percent of agency fees in dispute;

e) violates a holding in *Street* when it requires that objectors annually renew their objections to the union's ideological expenditures;

f) violates mandates of *Hudson* when it fails to give agency fee payers financial data pertinent to the fee calculation;

g) violates the plaintiff's rights as defined in *Abood* and *Street* when it returned a portion of his agency fee for the 2001-2002 fiscal year that is too small to account for the union's ideological expenditures in that year;

h) violates the plaintiff's rights as defined in *Abood* and *Street* when it failed to refund

2

any part of the plaintiff's agency fee for the 2002-2003 fiscal year, even though the union used some of that fee for ideological purposes over the timely objection of the plaintiff.

i) violated the plaintiff's rights as defined in *Hudson* when it failed to give him a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker for the fiscal years 1999/00, 2000/01, 2001/02, and 2002/03.

j) violated the plaintiff's rights under *Ellis* by obtaining from him an involuntary loan for purposes to which he objects in fiscal years 1999-2000, and 2000-2001.

k) violated the plaintiff's rights as defined in *Abood* and *Street* when it failed to provide him with an interest payment on the portion of his agency fee for the fiscal year 2000-2001 that it claimed was used for work-related expenses, but which in fact was used for non-chargeable expenses.

## UNDISPUTED MATERIAL FACTS

The exhibits cited here are those submitted with plaintiff's THIRD AMENDED COMPLAINT of January 19, 2004 and an exhibit attached to this memo: these comprise the PSC's own documents or answers to interrogatories and, therefore, cannot be legitimately disputed by the defendants. The PSC has not disputed that plaintiff informed it of his objection to its ideological expenditures for the fiscal years 1999 through 2004.

## ARGUMENT

### I. The PSC charges objectors for ideological activities that *Lehnert* specifies as non-chargeable

*Lehnert* holds that objectors may not be compelled to subsidize "legislative lobbying or other political union activities outside the limited context of contract

3

ratification or implementation" (*Lehnert* 500 U.S., at 522). The *Lehnert* court's discussion of a lower court ruling in the case indicates that contract "implementation" refers to "fiscal appropriations for, the union's collective-bargaining agreement" (*Lehnert* 500 U.S., at 519). Further, *Lehnert* cites as examples of non-chargeable activities "programs designed to secure funds for public education" (*Lehnert* 500 U.S., at 527); lobbying activities related "to financial support of the employee's profession or of public employees generally" (*Lehnert* 500 U.S., at 520); activities designed "to garner the support of the public" in the union's political lobbying efforts *(Lehnert* 500 U.S., at 522); and union "speech of a political nature in a public forum" (*Lehnert* 500 U.S., at 528). As shown below, the PSC routinely charges objectors for lobbying and other political activities that Lehnert indicates cannot be so charged.

### A. Lobbying outside the limited context of contract ratification or implementation

In regard to the PSC's legislative lobbying in particular, it should be noted that the union spends virtually nothing on lobbying for legislation pertinent to its contract, that is, on the *only* lobbying that the union may constitutionally charge to objectors. (The PSC acknowledges that it incurred only "minimal expense" —the cost of a few phone calls — lobbying for legislation pertinent to its collective-bargaining agreement; See Exhibit 6 of plaintiff's Third Amended Complaint [hereafter "TAC"]: Defendants' Interrog. Responses, Set 2, response #3). Thus, to conform to the *Lehnert* requirements, the PSC must designate as non-chargeable to objectors the *entire cost of all of its other lobbying activities* (i.e., the PSC cannot constitutionally charge to objectors those costs that go beyond the "minimal cost" of the "few phone" calls that it made in regard to contract-related legislation).

4

Evidence drawn from the PSC's own documents proves, however, that the union routinely charges objectors for lobbying activities that fall outside the limited context of contract ratification or implementation, including lobbying efforts designed to secure funds for public education, an activity that *Lehnert* specifically cites as non-chargeable (500 U.S., at 527). For example, the union charges objectors the full cost ($60,000) of hiring the Bolton St Johns lobbying firm (See TAC Exhibit 6: Defendants' Interrog. Responses, Attachment I, response #11) as part of union campaigns "for an improved CUNY budget from NYS and NYC, and for an improved contract" (See TAC Exhibit 3, Note 53). Similarly, it charges objectors the full cost for its "CUNY Budget Campaign" ($14,819), a campaign "designed to encourage New York State and New York City legislators to expand budget allocations for CUNY" (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #5). Salary costs for lobbying are also unconstitutionally assigned to objectors: the PSC deems chargeable the full cost of work activities by union staff concerning state and municipal budgets (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #8), although staff activities include "phone calls to get members to call Republican Senators since the Senate budget includes almost nothing for CUNY", and help "with the State budget lobbying push" (See TAC Exhibit 7). Other similar unconstitutional charges by the PSC for legislative lobbying activities are described in TAC ¶¶ 36 through 51.

## B. Speech of a political nature in a public forum: the PSC's public rallies, picket lines, concerts, and letter-writing campaigns

As revealed in the union's newspaper (See TAC Exhibit 10), the PSC "Contract Campaign" consists almost exclusively of public rallies, picket lines, concerts, and letter-writing campaigns designed to garner public support for the union's contract demands.

Such activities are clearly non-chargeable under *Lehnert*, for they represent "speech of a political nature in a public forum" (*Lehnert* 500 U.S. at 528), and an attempt "to garner the support of the public" (*Lehnert* 500 U.S. at 522). The PSC nonetheless charges objectors the full cost ($76,002) of its "Contract Campaign" (See TAC Exhibit 1, Note 3, *Office supplies, printing, and publishing*; and Exhibit 2, line 57), in clear violation of the *Lehnert* proscription against charging objectors for political speech by the union.

It should also be noted that the PSC deems 100% of its "Chapter Budgets" ($48,213: See TAC Exhibit 2, line 50) to be chargeable to objectors (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #1), although examination of a typical agenda for the campus chapters (See TAC Exhibit 11) reveals that the work of chapter chairs involves non-chargeable political activities, such as having union members at their campuses mail or fax letters to politicians; organizing campus discussions of the union's position on U.S. foreign policy; and encouraging participation in union rallies for transit workers, open admission at CUNY, and civil liberties.

**C. Public relations activities unrelated to contract ratification and implementation**

The PSC engages in extensive public relations activities in an effort to gain public support for its positions on various political issues. These public relations activities are non-chargeable under *Lehnert* because they represent "political union activities outside the limited context of contract ratification or implementation" (*Lehnert* 500 U.S., at 522); are designed "to garner the support of the public" *(Lehnert* 500 U.S., at 522); and involve union "speech of a political nature in a public forum" (*Lehnert* 500 U.S., at 528).

Despite the *Lehnert* proscriptions, the PSC charges objectors for its extensive public relations activities. For example, the union charges objectors $75,078 (90% of the cost) for hiring the Ken Sunshine public relations firm (See TAC Exhibit 6: Defendants'

6

Interrog. Responses, Attachment I, response #11) as part of a union campaign "for an improved CUNY budget from NYS and NYC, and for an improved contract" (See TAC Exhibit 3, Note 53). Further, it defines as chargeable to objectors its work "with community organizations, civic groups, government agencies and the media in connection with funding for jobs and contractual increases" (See TAC Exhibit 1, under Note 2), despite the fact that community organizations, civic groups and the media are non-governmental bodies that have no responsibility for ratifying, implementing, or appropriating funds for the PSC's collective-bargaining agreement. Salary costs for public relations are also unconstitutionally assigned to objectors: the PSC defines as chargeable to objectors 98% of the salary of its Director of Public Relations, Mary C. Cage (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #7c), even though a public relations director is *by definition* dedicated to publicizing the union's positions in an effort to win public support. (The 2% of the director's work activities designated as non-chargeable relate to her work with the International Committee and that related to non-chargeable union contributions.) Another similar unconstitutional charge by the PSC for public relations activities is described in TAC ¶¶ 64 through 67.

### D. <u>Reports in its newspaper concerning non-chargeable activities</u>

*Lehnert* 500 U.S. (at 527) specifies that objectors may not be charged for union programs designed to secure funds for public education, and *that portion of union newspapers that report these activities*. In clear violation of this *Lehnert* proscription, the PSC charge objectors for the publication in its paper (*The Clarion*) of numerous news articles concerning its efforts to secure funds for public education. For example, it does not list as rebatable to objectors (See TAC Exhibit 12, a document obtained from the PSC during discovery) the news articles on the union's efforts to secure funds for public

7

education that are reproduced in TAC Exhibit 13 and described in TAC ¶ 76. Further, the PSC charges to objectors the costs for publishing news articles that are political in nature, despite that *Lehnert* cites (at 522) the discussion of governmental affairs in a public context as an example of a non-chargeable expense. For example, the PSC does not list as rebatable to objectors (See TAC Exhibit 12) the news articles on a cafeteria boycott, and the lobbying efforts of a transit union that are reproduced in TAC Exhibit 13 and described in TAC ¶ 81. Indeed it is union policy to charge objectors the costs for publishing news articles that are political in nature: in a document obtained from the PSC during discovery (See TAC Exhibit 12), the PSC *defines* as chargeable articles on "CUNY tuition hikes", and "bargaining by other city workers."

### E. Reports on its website concerning non-chargeable activities

*Lehnert* 500 U.S. (at 528) indicates that "speech of a political nature in a public forum" is not chargeable to objectors, and cites (at 522) the discussion of governmental affairs in a public context as an example of a non-chargeable expense. *Lehnert* also specifies (at 527) that objectors may not be charged for portions of union newspapers that report on union programs designed to secure funds for public education.

Cyberspace is a public forum, the PSC website is part of that forum, and a union website is directly analogous to a union newspaper. Thus, under the principles of *Lehnert* (at 527-529), the PSC cannot constitutionally charge objectors for the costs of items on its website that are political in nature and that do not concern legislative ratification of, or fiscal appropriations for, the collective-bargaining agreement for CUNY workers.

Some of the reports that appear on the union website are political in nature (such as those designed to secure funds for public education) and do not concern legislative ratification of, or fiscal appropriations for, the collective-bargaining agreement for

CUNY workers (for example, See TAC Exhibit 14). The PSC, however, does not designate as rebatable to objectors *any* of the $25,700 costs associated with publishing its website (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #17), in violation of *Lehnert's* proscription against charging objectors for "speech of a political nature in a public forum" (*Lehnert* 500 U.S., at 528).

### F. Salary and other expenses for non-chargeable activities

The PSC bases its determination of chargeable salary costs on "a review of all work activities of each employee for the year ended August 31, 2002" (See TAC Exhibit 1: *Salaries*, under Note 3). But as seen above and in TAC ¶¶ 24-74, the PSC's definition of a chargeable activity is unlawful: in defiance of *Lehnert* guidelines, the union classifies various ideological activities (e.g. the rallies of its contract campaign) as chargeable. Thus, the PSC's assessment of chargeable salary expenses exceeds that permitted under law because it is based on an definition of chargeable work activities that is more permissive than that allowed in *Lehnert*.

It should be further noted that the PSC assesses chargeable expenses in the categories fringe benefits, occupancy, office supplies, telephone expenses, (part of) repairs/maintenance, and insurance based on its assessment of chargeable salary expenses (See TAC Exhibit 1, under Note 3). Given that the union unlawfully exaggerates its chargeable salary expenses, all of its assessments of chargeable expenses in the aforementioned categories are likewise exaggerated.

### G. Legal costs for issues other than contract negotiations

The PSC acknowledges that its legal consultants take CUNY to court over issues other than contract negotiations (See TAC Exhibit 3, Note 62). The PSC, however, deems 100% of the $65,736 cost for its legal consultants to be chargeable to objectors (See TAC

Exhibit 6: Defendants' Interrog. Responses, Set 1, Attachment 1, response #11). Legal costs unrelated to contract negotiations fall outside the limited context of contract ratification or implementation, and are therefore not chargeable to objectors under *Lehnert* (at 519-529).

## H. The PSC charges objectors for non-chargeable expenses of the state and national labor organizations with which it is affiliated

*Hudson* 475 U.S. (at 307) indicates that a union's payment to its affiliated state and national labor organizations may not be used to subsidize activities for which an objecting fee payer may not be charged. Nonetheless, the PSC charges objectors for activities by its affiliated unions (the AFT and NYSUT) that *Lehnert* indicates are not constitutionally chargeable, as the following examples demonstrate.

**Example #1:** The PSC and its national affiliate the AFT define as chargeable to objectors (including PSC objectors) the AFT's "communications with community organizations, civic groups, government agencies and the media in connection with funding for jobs and contractual increases" (See TAC Exhibit 5, under Note 2). Community organizations, civic groups, and the media are non-governmental bodies that have no responsibility for ratifying, implementing, or appropriating funds for the PSC's collective-bargaining agreement. Thus, communications with these groups constitute political activity outside the limited context of contract ratification and implementation and, as such, are non-chargeable under *Lehnert* (500 U.S., at 522). Further, any salary expenses or other expenses incurred by the AFT in support of these political communications must likewise be deemed non-chargeable.

**Example #2:** The PSC and its affiliate the AFT charge to objectors 100% of the costs for media services used "to promote the union"" and "to explain the Federation's

10

positions in educational reform on such issues as educational changes in the profession, class size, modern methods of teaching and school structure, financial improvements, educational accountability issues, and educational restructuring of schools" (See TAC Exhibit 5, Note 3e). These public relations activities constitute speech of a political nature in a public forum and, as such, are non-chargeable under *Lehnert* (500 U.S., at 528).

**Example #3:** The PSC and its parent the AFT charges to objectors the costs for of articles in AFT publications that deal with "class size and educational reform issues on new and advanced methods of classroom instruction" (See TAC Exhibit 5, Note 3d). Published articles dealing with "class size and educational reform issues" are not chargeable under *Lehnert* because they represent discussion of governmental affairs in a public context *(Lehnert* 500 U.S., at 522); and speech of a political nature in a public forum (*Lehnert* 500 U.S., at 528).

**Example #4:** The PSC and its state affiliate NYSUT charge to objectors all expenses for "Legislative Action" (described as "lobbying and legislative activity") with the exception of expenses for political education of its membership. The total charged objectors is $425,024 (See TAC Exhibit 4, under Note 3f). The PSC acknowledges that it, the AFT, and NYSUT incurred only "minimal expense" (the cost of a few phone calls) lobbying for legislation pertinent to the PSC's collective-bargaining agreement. (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 2, response #3). *Lehnert* holds that the *only* lobbying activities that may be constitutionally charged to objectors are those concerning "legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement" (at 519). Thus, to conform to the *Lehnert* requirements, none of

11

the $425,024 expense for "Legislative Action" by NYSUT, save for the cost of a few phone calls regarding legislation dealing with the PSC's contract, is constitutionally chargeable. Further, any salary expenses or other expenses incurred by NYSUT in support of its "Legislative Action" program must likewise be deemed non-chargeable.

## II. The PSC's financial disclosure to fee payers is inadequate under the standards defined in *Hudson*

*Hudson* holds that unions must provide fee payers with "an adequate explanation" of the basis of the fee" (475 U.S., at 310). The information provided potential objectors must be sufficient "to gauge the propriety of the union's fee" (475 U.S. at 306), including "the reasons why [nonmembers] were required to pay their share" of the union's collective bargaining expenses (475 U.S., at 307). The following examples (all drawn from the PSC's Report to Fee Payers-FY 01/02, the most recent financial report made available to fee payers) demonstrate that the PSC does not fulfill this *Hudson* mandate.

**Example #1:** The PSC charges objectors the full cost for its "CUNY Budget Campaign" ($14,819), a lobbying campaign "to expand budget allocations for CUNY" (See TAC Exhibit 6: Defendants' Interrog. Responses, Set 1, response #5). This campaign is clearly non-chargeable under *Lehnert* (500 U.S., at 519-528), for it represents lobbying outside the limited context of contract ratification or implementation. Fee payers, however, are kept totally in the dark about this expenditure: the PSC does not report the existence of its "CUNY Budget Campaign" anywhere in its Report to Fee Payers-FY 01/02 (See TAC Exhibit 1). Thus, fee payers cannot possibly discern from the PSC's report that their fees are subsidizing a lobbying campaign that cannot be constitutionally charged to objectors.

**Example #2:** As revealed in the union's newspaper (See TAC Exhibit 10), the PSC "Contract Campaign" consists almost exclusively of public rallies, picket lines, concerts, and letter-writing campaigns designed to garner public support for the union's contract demands. Such activities are clearly non-chargeable under *Lehnert*, for they represent "speech of a political nature in a public forum" (*Lehnert* 500 U.S. at 528), and an attempt "to garner the support of the public" (*Lehnert* 500 U.S. at 522). The PSC nonetheless charges objectors the full cost ($76,002) of its "Contract Campaign" (See TAC Exhibit 1, under Note 3, *Office supplies, printing, and publishing*; and Exhibit 2.) In its Report to Fee Payers-FY 01/02 (See TAC Exhibit 1), however, the PSC does not provide a description of the activities comprising its "Contract Campaign" it simply asserts, without providing details, that the activities associated with its "Contract Campaign" concern "terms and conditions of employment," and are therefore 100% chargeable. Absent a specific description of the "Contract Campaign" in the PSC report to fee payers, they cannot possibly discern that their fees are subsidizing public rallies, picket lines, concerts, and letter-writing campaigns that cannot be constitutionally charged to objectors.

**Example #3:** In its Report to Delegates-FY 01/02, the PSC indicates that it spent $166,510 in the category "Conferences, Meetings, Legislation" (See TAC Exhibit 2, line 51), and that a portion of those expenses involves the costs of "Albany lobby activities" (See TAC Exhibit 3, Note 48). The PSC's Albany lobbying activities are not lawfully chargeable to objectors, under *Lehnert* 500 U.S., at 519-528. The PSC acknowledges, however, that it cannot separately identify the amount of money that it spent on "Albany lobby activities" because it does not subdivide expenses in its "Conferences, Meetings,

Legislation" category (See TAC Exhibit 6: Defendants' Responses Interrogatories, Set 1, response #2). Given that the union *itself* cannot identify what portion of $166,510 was spent on its (non-chargeable) "Albany lobby activities" (i.e., the "legislation" portion of the "Conferences, Meetings, Legislation" category), it cannot possibly provide fee payers with sufficient information to gauge the propriety of the union's fee in that regard.

**Example #4:** The PSC's internal documents (See TAC Exhibit 3, Note 53) indicate that it hired a lobbying firm to lobby for improved state budgets, and a public relations firm to boost the union's visibility, activities that may not be constitutionally charged to objecting fee payers under *Lehnert* 500 U.S. (at 519-528). The PSC's interrogatory responses indicate that the union deemed as chargeable to objectors the full $60,000 cost for hiring the lobbying firm (Bolton St. Johns) and 90% of the $83,420 cost (i.e., $75,078) for the public relations firm (Sunshine): thus objectors were charged a total of $135,078 for hiring these two firms (See TAC Exhibit 6: Defendants' Interrog. Responses, Attachment I, response #11). In its Report to Fee Payers-FY 01/02 (See TAC Exhibit 1, under note 3, professional fees), however, the PSC does not provide the names of the lobbying and public relations firms that it hired, nor does it describe the purposes for which they were hired: it simply asserts, "Based on the review of fees paid to miscellaneous consultants, 5.3% of expenses were deemed possibly political or ideological in nature." Absent any indication that lobbying and public relations firms were hired and a description of the purpose for hiring those firms, fee payers cannot possibly discern that their fees are subsidizing lobbying and public relations activities (at a cost of $135,078) that cannot be constitutionally charged to objectors.

**Example #5:** The PSC neither lists nor describes any of the activities that it

designates as chargeable in the category "Other Expenses": the union simply asserts, "The remainder of other expenses [$50,359] benefits the entire bargaining unit and are chargeable" (See TAC Exhibit 1: Note 3, and "Statement of Expenses and Allocation"). A fee payer cannot judge the propriety of the union's assertion that this $50,359 expense is chargeable in the absence of any description of the activities supported by this expense. Indeed, the PSC's failure to provide adequate information obscures the fact that ideological expenditures were improperly charged to objectors. As the plaintiff learned through interrogatories, the PSC includes the $7,283 costs of its Diversity Committee (whose purpose is to promote ethnic and gender diversity in hiring etc.) in the "Other expenses" category, and deems those costs to be 100% chargeable to objectors (See TAC Exhibit 6: Defendants' Interrog. Responses, Set I, Attachment II, response #16), despite that such activities are clearly political (i.e., non-chargeable) in nature.

**Example #6:** In its Report to Fee Payers-FY 01/02, the PSC asserts that a variety of its activities are chargeable because they are "work-related" (See TAC Exhibit 1, Note 2, chargeable expenses), but the union does not explain the specific nature of these allegedly work-related activities. For example, it deems chargeable "addressing work-related problems"; "work-related conferences"; "research in connection with work-related subjects"; and "lobbying and legislative activities with respect to matters concerning work-related issues." Fee payers who are told only that an activity is "work related" do not have enough information to determine that some of these allegedly work-related activities include those that may not, contrary to the PSC claim, be constitutionally charged to objectors (e.g., rallies, public relations activities, and lobbying to secure funds for public education: See above and TAC ¶¶ 24 – 121).

15

## III. The PSC failed to exhibit the requisite good faith in protecting rights of nonmembers

As a public sector union that is designated as an exclusive representative of employees, the PSC is under a duty of fair representation (*Abood* 431 U.S., at 223-224). Under its duty of fair representation, the PSC is required to exhibit "complete good faith and honesty, and to avoid arbitrary conduct" (*Vaca* v. *Sipes* 386 U.S., at 177). Further, "The union as the statutory representative of the employees is 'subject always to complete good faith and honesty of purpose in the exercise of its discretion' (*Hines* v. *Anchor Motor Freight, Inc.*, 424 U.S. 554, 564, quoting *Ford Motor Co.* v. *Huffman*, 345 U.S. 330, 338). The examples listed below show, however, that the PSC flouts its obligation to act in good faith when it violates the rights of fee payers in a manner that can only be viewed as willful.

### A. It creates a willfully deceptive account of expenditures to hide *Lehnert* violations

The proscription against forcing fee payers to subsidize a union's political speech in a public forum (*Lehnert* 500 U.S., at 528) and against attempts by a union to garner public support is clear (*Lehnert* 500 U.S., at 522). No one could honestly and rationally regard the public rallies, picket lines, concerts, and letter-writing campaigns of the PSC's "contract campaign" (See TAC Exhibit 10) as anything but political speech in a public forum. Yet in its financial report to fee payers, the PSC (1) lists its "contract campaign" expenditures in a category titled *Office supplies, printing, and publishing*; (2) fails to describe the activities beyond saying that they involve "terms and conditions of employment for the entire bargaining unit," and; (3) claims the campaign is 100% chargeable to objectors (Exhibit TAC Exhibit 1, under Note 3).

The PSC's placement of expenditures for public rallies, picket lines, concerts, and

16

letter-writing campaigns in a category titled *Office supplies, printing, and publishing*, and its failure to include any meaningful description of those campaign activities, can only be viewed as a willful attempt by the PSC to hide the true nature of these expenditures from fee payers. Further, the PSC's designation of a public political campaign as 100% chargeable to objectors, a designation that was facilitated by its deceptive description of that campaign in its report to fee payers, can only be viewed as a deliberate attempt by the union to spend objector's fee money in willful defiance of the *Lehnert* guidelines.

### B. Willfully withholding existing information from fee payers

As demonstrated above and in (TAC ¶¶ 122-149), the PSC has failed to provide potential objectors with "sufficient information to gauge the propriety of the union's fee" as required by *Hudson* 475 U.S. (at 306-310). The evidence below demonstrates that the PSC's failure to provide sufficient information is by design.

Each year, the PSC prepares for its Delegate Assembly a detailed accounting of its expenditures that lists 47 expense categories (See TAC Exhibit 2) along with descriptions of the activities supported by those expenditures (See TAC Exhibit 3). In its report to fee payers, however, the PSC lists only twelve expense categories, rather than the 47 listed in the Delegate Assembly report, and describes the activities supported by those expenditures in far less detail than it does in its Delegate Assembly Report (compare TAC Exhibit 1 to TAC Exhibits 2 and 3). Thus, the PSC's failure to provide fee payers with "sufficient information to gauge the propriety of the union's fee" cannot be attributed to the burdensome nature of supplying information: rather it results form the union's *deliberate choice not to share with fee payers pertinent information that already exists in its records.* The information withheld from fee payers can be critical: for example, while fee payers are told only that they are charged for "Miscellaneous

17

consultants" (See TAC Exhibit 1), the union's more detailed internal report shows that $60,000 of these fees are used to lobby for "an improved CUNY budget from NYS and NYC" (See TAC Exhibit 3) and, therefore, are not in fact chargeable under *Lehnert*.

## C. The PSC's deceptive claim regarding is allocation of payroll expenses

In its Report to Fee Payers-FY 01/02 (See TAC Exhibit 1: under note 3), the PSC claims that it allocated payroll expenses to chargeable and not chargeable categories "based on a review of all work activities of each employee." The PSC acknowledged, however, in an interrogatory response to a question about its allocation of payroll, "There is no list of work activities developed for each employee." (See TAC Exhibit 6: Defendants' Responses to, Set 1, Attachment I, response #7a). That the PSC claimed to have arrived at its allocation of chargeable expenses through "a review of all work activities of each employee," when in fact no such listing of all work activities for each employee exists, is yet another example of the deceptive (i.e., bad faith) nature of its report to fee payers.

## D. The historic pattern of bad faith by the PSC

The PSC's willful and flagrant disregard for the rights of fee payers evident in its current actions is part of pattern of bad faith exhibited by it towards fee payers. The PSC breached its obligation to act in complete good faith when it ignored for 16 years the mandate in *Hudson* 475 U.S. 292 (1986) to provide objectors with an opportunity for prompt arbitration, and to provide *all* agency fee payers with financial information regarding the basis for the fee. The fact that the PSC has *still* failed to bring its current policy in complete compliance with the requirements of *Hudson* (See the TAC, FOURTH CLAIM FOR RELIEF), even after repeated prompting by the court in this case (See TAC

18

¶ 12), is yet another indication of the PSC's bad faith in protecting the rights of fee payers. The PSC's actions over the years and currently reveal a disregard of its duty of fair representation under *Vaca* 386 U.S. (at 177) that, assuming the PSC was aware of the pertinent case law, can only be regarded as willful.

### IV. PSC policy includes an impermissible barrier to arbitration

*Hudson* 475 U.S. (at 306-307) indicates that a fee payer who simply makes known his objection to the fee calculation (at 306, note 16) is entitled to have "his objections addressed in an expeditious, fair, and objective manner" (at 307). Under current PSC procedures, in order to gain the opportunity to challenge before an arbitrator the "final refund determination", an objector "must indicate to the union local president the percent of agency fees that s/he believes is in dispute" (See TAC Exhibit 15, paragraph 10). PSC procedures that make final arbitration conditional on an objector's identification of the percent of agency fees in dispute place a burden on objectors that goes beyond that allowed under *Hudson* 475 U.S. (at 306-307).

### V. The PSC's requirement that objections be annually renewed violates *Street, Abood,* and *Hudson*

Under the current procedures (See TAC Exhibit 15, paragraph 3), the PSC restricts the time period in which fee payers may register objections to between May 1 and May 31 of the year prior to the fiscal year to which the objection pertains. A registered objection in any particular year is valid for only one year: objectors must renew their objection on a yearly basis if they wish to maintain eligibility for a rebate of their *pro-rata* share of the union's ideological expenditures (See TAC Exhibit 15). The PSC's resurrection on a yearly basis of its power to use an objectors' fees over their objection is proscribed under *Street* 367 U.S. (at 771) and *Abood* 431 U.S. (at 238),

which hold that once objectors make known to the union their objection to the use of their money for the support of political causes, the union is "without power to use payments thereafter tendered" by such objectors for such causes. "*[T]hereafter" is a limitless time period, not one that expires yearly.* Thus, the PSC has no power to unilaterally reverse a fee payer's objection just because a year has passed. Further, the PSC requirement that objections to ideological expenditures be renewed annually runs counter to the *Hudson* (475 U.S., at 303) mandate that procedures be carefully tailored to minimize constitutional infringements: the only burden that fee payers bear is to object (*Hudson* 475 U.S. at 306, note 16), not to *repeatedly* object. (See also *Shea* v. *International Association of Machinists & Aerospace Workers*, 154 F.3d 508; 1998; at 515)

## VI. The PSC violates *Hudson* mandates that (a) fee payers be "given" the union's financial records and (b) that unions minimize the infringement on the rights of fee payers

*Hudson* is specific in stating that fee payers be given union records pertinent to the fee calculation: "Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that potential objectors be given sufficient information to gauge the propriety of the union's fee" *Hudson* 475 U.S. (at 306). In April 2003, prompted by a suggestion of this court at a hearing of March 10, 2003, the PSC modified the language in its stated agency fee procedures to indicate that the union would provide fee payers with financial information prior to each year's objection period. Although the language in the PSC's current policy is now in accord with the *Hudson* mandate to give fee payers pertinent financial data, actual PSC practice is not: in defiance of its own policy and the *Hudson* mandate, the PSC failed both this year and last to give fee payers the requisite information, as demonstrated in the letters to fee payers from the

union of April 2004 and June 2003 (See Summary Judgment Memo Exhibit A [hereafter SJM Exhibit A]; and TAC Exhibit 16).

*In regard to this year's rebate*: On April 15, 2004 the PSC wrote a letter informing agency fee payers of their right to object to the union's political expenditures for the fiscal year 2004/05, and indicating that to be valid such objections must be filed during the May objection period (See SJM Exhibit A). The letter was not accompanied by the requisite financial information regarding the agency fee calculation. Indeed, the letter made no reference to the existence of those records. Even now, days after the beginning of the May 2004 objection period, the PSC has yet to provide the requisite information. The failure of the PSC to provide agency fee payers with the financial data pertinent to the fee calculation violates the *Hudson* mandate that potential objectors (i.e., all fee payers) be given sufficient information to gauge the propriety of the union's fee (*Hudson* 475 U.S., at 306).

*In regard to last year's rebate*: On June 30, 2003 the PSC wrote a letter informing agency fee payers of their right to object to the union's political expenditures for the fiscal year 2003/04 (See TAC Exhibit 16). Because the PSC had (prompted by this court case) just revised their agency fee policy, it allowed for an extended objection period (applying only to the 2003/04 fiscal year). This letter was, however, not accompanied by the required financial information: rather, fee payers were instructed to visit a website or call the PSC office for those data (See TAC Exhibit 16, ¶ 4). The PSC requirement that fee payers visit its website or call its office to obtain financial data conflicts with the *Hudson* 475 U.S requirements that fee payers be "given" (at 306) the union's financial records (not merely *an opportunity to seek out* those records).

Further, the PSC requirement that fee payers visit its website or call its office to obtain financial data clearly imposes added burdens on fee payers and, thereby, conflicts with the *Hudson* 475 U.S. mandate that unions minimize the infringement on the rights of fee payers (at 302-303). For example, by sending fee payers to its website for financial information, the fee payer is inconvenienced in the same manner that this court would be inconvenienced if a plaintiff, rather than directly filing a complaint with the court, requested that the court go to a website to view it. In addition, the fee payer, rather than the union, now bears the costs of printing the data. Adding to the burden is that some home office printers have difficulty printing some website pages.

It should be noted that the PSC itself recognizes the inferiority of website communication vs. mailing. The PSC's preferred method of communicating with both members and fee payers is via the U.S. mail: it sends announcements, surveys its members, and holds union elections by mail. It should also be noted that a member of a PSC committee that deals with union benefits stated specifically that "many people don't look at the website" (See TAC Exhibit 17, ¶ 7).

Thus, in regard to fiscal year 2003/04, rather than conform to the *Hudson* requirements, the PSC did precisely the opposite: it tailored union procedures to impose added burdens on fee payers, and made them seek out information that the union was already obligated to give them.

## VII. The PSC returned a portion of the plaintiff's agency fee for the 2001-2002 fiscal year that is too small to account for the union's ideological expenditures

On August 21, 2003, the PSC rebated to the plaintiff $115.88 of his agency fee, alleging that this payment represented the portion of the plaintiff's fee that it spent for ideological purposes for the fiscal year 2001-2002, plus interest at the legal rate. The PSC

based its calculation of the rebate for that year on its "Report to Fee Payers-FY 01/02" (See TAC Exhibit 1). As the Plaintiff has demonstrated, that PSC report designates as chargeable to objecting fee payers ideological expenditures that cannot be so charged under the holdings of *Lehnert* (See Section I, above, and TAC ¶¶ 24 – 121). Therefore, the PSC's calculated rebate for 2001-2002 does not return to objectors all the money that they are entitled to under *Lehnert*. That the PSC returned a portion of the plaintiff's agency fee for the 2001-2002 fiscal year that is too small to account for the union's ideological expenditures in that year abridges his rights to a refund of *all* ideological expenditures, as mandated in *Street* 367 U.S. (at 771) and *Abood* 431 U.S. (at 238).

## VIII. The PSC failed to rebate of any part of plaintiff's agency fee for fiscal year 2002/03, despite his timely objection to the union's ideological expenditures

As of this date, the PSC has not returned any portion of the plaintiff's agency fee for the fiscal year 2002-2003, in spite of the fact that he informed the PSC on May 3, 2002 of his objection to its ideological expenditures for that fiscal year. *Street* 367 U.S. (at 771) and *Abood* 431 U.S. (at 238) hold that once objectors make known to the union their objection to the use of their money for the support of political causes, the union is "without power to use payments thereafter tendered" by such objectors for those political causes. Thus, the failure of the PSC to return any of the plaintiff's agency fee for the fiscal year 2002-2003, despite his timely objection, violates his First and Fourteenth Amendment rights as defined in *Street* and *Abood*.

## IX. The PSC failed to provide plaintiff with a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decision-maker

*Hudson* held that a union's collection of agency fees include a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker

(*Hudson* 475 U.S., at 310). The plaintiff informed the PSC of his objection to its ideological expenditures for the fiscal years 1999/00, 2000/01, 2001/02, and 2002/03 in letters to the union of May 5, 1999, May 13, 2000, May 4, 2001, May 3, 2002, and May 1, 2003 respectively. Other than for fiscal year 2003/04, the PSC failed to offer the plaintiff a reasonably prompt opportunity for arbitration in response to his timely objections: the only other opportunity the union gave the plaintiff to go before an arbitrator came in September 2002, in response to the plaintiff's objection of May 2000 to ideological expenditures made in the 2000/01 fiscal year (i.e., arbitration was offered 27 months after the objection was registered). The PSC's failure to provide the plaintiff with a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decision-maker, despite the fact that the plaintiff registered his objections to ideological expenditures in a timely manner, abridged his First and Fourteenth Amendment rights as defined in *Hudson* 475 U.S., at 310.

## X. The PSC obtained from the plaintiff an involuntary loan for purposes to which he objects

*Hudson* 475 U.S. (at 305) indicates that it is impermissible even *to risk* the possibility that fee payers' contributions may be temporarily used for impermissible purposes. *Ellis* v 466 U.S. (at 444) holds that a union does not completely undo a constitutional violation when, after using a portion of agency fees for ideological purposes, it refunds with interest that portion of the fee to an objector: "Even then the union obtains an involuntary loan for purposes to which the employee objects."

At a hearing before this court (9/30/02), the PSC conceded its failure to return any of the plaintiff's agency fee for 1999-2000. It returned the fee in November 2002. The PSC's unfettered use of the plaintiff's entire agency fee for more than two years caused

him constitutional harm (as per *Ellis* v 466 U.S., at 444) because the union had obtained from him an involuntary loan for ideological purposes to which he objects. This is also true for the plaintiff's fee for 2000-2001. That the PSC returned $637.52 of the plaintiff's fee for 2000-2001 on October 17, 2002 (i.e., about one year late: see TAC Exhibit 19) does not undo the constitutional harm to the plaintiff as defined in *Ellis* because the union used a portion of that money from 2000-2001 for ideological purposes to which the plaintiff objects[1] and, in this instance, without paying interest on that involuntary loan.

## CONCLUSION

The plaintiff has demonstrated above that there is no issue of any material fact and that the plaintiff is entitled as a matter of law to an Order directing entry of a summary judgment in favor of the plaintiff and against defendants as follows: (1) granting summary judgment in regard to all the plaintiff's CLAIMS FOR RELIEF, as presented in his THIRD AMENDED COMPLAINT of January 19, 2004 and, (2) providing the plaintiff with all the relief he asks under DEMAND FOR RELIEF in his THIRD AMENDED COMPLAINT.

Dated May 4, 2004
North Haven, Connecticut

DAVID SEIDEMANN
Plaintiff, Pro Se
38 Garfield Avenue
North Haven, CT 06473

---

[1] Because the PSC now admits that ideological expenditures "had not been fully counted" in the past (i.e., before 4/1/03: See TAC Exhibit 18).

# PSCcuny /

**Professional Staff Congress / City University of New York**
25 West 43rd Street ● New York, New York 10036 ● 212/354-1252 ● Fax 212/302-7815
Visit our website at http://www.psc-cuny.org

**OFFICERS**

Barbara Bowen
President

Steven London
First Vice President

Cecelia McCall
Secretary

John Hyland
Treasurer

Stanley Aronowitz
Jonathan Buchsbaum
Robert Carter
Susan O'Malley
Sheldon Weinbaum
University-wide Officers

Michael Fabricant
Vice President Senior Colleges

Robert Cermele
Janice Cline
Nancy Romer
Senior College Officers

Anne Friedman
Vice President
Community Colleges

Samuel E. Farrell
Andrew McInerney
Shirley Raasher
Community College Officers

Iris DeLutro
Vice President
Cross Campus Units

Arthurine DeSola
Steven Trimboli
Vera Weekes
Cross Campus Officers

Marcia Newfield
Vice President
Part-Time Personnel

Susan DiRaimo
Diane Menna
Vincent Tirelli
Part-Time College Officers

Irwin H. Polishook
President Emeritus

Israel Kugler
Deputy President Emeritus

Peter I. Hoberman
Vice President Emeritus
Cross Campus Units

**STAFF**

Deborah E. Bell
Executive Director

Mary Ann Carlese
Associate Executive Director

Faye H. Alladin
Coordinator,
Financial Services

Debra Bergen
Director, Contract Administration
& University-wide
Grievance Counselor

Mary Crystal Cage
Director, Public Relations

Barbara Gabriel
Office Manager

Peter Hogness
Newspaper Editor

Diana Rosato
Coordinator, Membership

D. Nicholas Russo
Director, Legal Affairs

Clarissa Gilbert Weiss
Director, Pension &
Welfare Benefits

April 15, 2004

Dear Colleague:

Enclosed is a copy of the PSC **Agency Fee Refund Procedure**. It outlines the steps that an agency fee payer – not a union member – may take if she/he chooses to object to the union's expenditures on political or ideological expenses and wants to have her/his *pro rata* share of those expenses refunded.

According to the procedure, an agency fee objector who elects to file her/his objections for PSC fiscal year 2004/05 will receive a check for the projected amount of the rebatable expenses prior to the start of the fiscal year, September 1st. The filing period is the month of May prior to the start of the PSC's next fiscal year.

Of course, you do not have to remain an agency fee payer. By simply filling out and returning a membership card, you will be enrolled as a PSC member and as such you can contribute to its strength and influence its direction. In contrast, as a fee payer you are an outsider unable to vote either in union elections or in ratification referenda on proposed collective bargaining agreements. If you would like to enroll as a member in the union, please call the PSC office and ask a staff person in the Membership Department to send you a membership card to fill out and return.

The combined strength of the union's membership speaks forcefully in the fights for public funding for higher education and for a new collective bargaining agreement that comprehensively rebuilds the University. You are enthusiastically invited to join as a PSC member in these crucial efforts.

Yours sincerely,

Deborah E. Bell
Executive Director

American Association of University Professors
American Federation of Teachers Local 2334 ● New York State AFL-CIO
New York State United Teachers ● New York Labor Council



United States District Court
Eastern District of New York _____ X
                                              :
DAVID SEIDEMANN                               :
                                              :
                    Plaintiff,                :
                                              :
                                              :       Docket No.
        -against-                             :   -CV- 02-3389 (SJ) (LB)
                                              :       <u>Pro Se</u>
BARBARA BOWEN, personally and in her capacity :
as President of the PSC/CUNY (Professional Staff :
Congress/City University of New York), and PSC/CUNY :
                                              :
                    Defendants                :
_____ X

## <u>PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS</u>

1) Exhibit 1 of the plaintiff's THIRD AMENDED COMPLAINT (hereafter TAC) is a true copy of the PSC's "Statement of expenses and allocation between chargeable expenses and non-chargeable expenses" for fiscal year 2001-2002, including the PSC's "Notes" to that statement.

2) Exhibit 2 of the plaintiff's TAC is a true copy of a PSC financial statement that was distributed to members of its Delegate Assembly.

3) Exhibit 3 of the plaintiff's TAC is a true copy of explanations and notes that the PSC distributed to members of its Delegate Assembly with regard to its draft budget for fiscal year 2001-2002.

4) Exhibit 4 of the plaintiff's TAC is a true copy of the "Consolidated schedule of expenses and allocation between chargeable and nonchargeable expenses" for fiscal year 2001-2002 for the New York State United Teachers union, including its "Notes" to that statement.

1

5) Exhibit 5 of the plaintiff's TAC is a true copy of the "Combined statement of general fund and militancy/defense fund expenses and allocation between chargeable expenses and non-chargeable expenses" for fiscal year 2001-2002 for the American Federation of Teachers union, including its "Notes" to that statement.

6) Exhibit 6 of the plaintiff's TAC is a true copy of the plaintiff's interrogatories (dated August 14, 2003 and November 13, 2003) and the defendants' responses (dated December 12, 2003) to those interrogatories.

7) Exhibit 7 of the plaintiff's TAC is a true copy of excerpts from the Minutes of PSC Delegate Assembly meetings of June 14, 2001 and May 30, 2002, with titles and markings added by the plaintiff to direct attention to some portions.

8) Exhibit 8 of the plaintiff's TAC is a true copy of an excerpt from the Minutes (dated April 1,2003) of the PSC Executive Committee meeting, with titles and markings added by the plaintiff to direct attention to some portions.

9) Exhibit 9 of the plaintiff's TAC is a true copy of an e-mail message sent by defendant Barbara Bowen.

10) Exhibit 10 of the plaintiff's TAC is a true copy of two pages from the "Contract Special/May 2002" issue of the PSC newspaper, the *Clarion*.

11) Exhibit 11 of the plaintiff's TAC is a true copy of a Proposed Agenda for a PSC Chapter Chairs Meeting of April 18,2002, and a PSC Memo of April 25,2002 to Chapter Chairs regarding that meeting, with markings added by the plaintiff to direct attention to some portions.

12) Exhibit 12 of the plaintiff's TAC is a true copy of a PSC document (that the PSC provided the plaintiff during discovery) that describes the PSC criteria for assigning chargeable/non-chargeable designations to articles in its newspaper, the *Clarion*.

13) Exhibit 13 of the plaintiff's TAC is a true copy of six pages from issues of the PSC newspaper, the *Clarion*, from fiscal 2001-2002.

14) Exhibit 14 of the plaintiff's TAC is a true copy of a web page on the PSC website (downloaded 1/13/04).

15) Exhibit 15 of the plaintiff's TAC is a true copy of the current PSC Agency Fee Procedure (adopted by the PSC Delegate Assembly on April 30, 2003).

16) Exhibit 16 of the plaintiff's TAC is a true copy of a letter of June 20 2003 from PSC Executive Director that includes a description of procedures that agency fee payers must follow in order to obtain information from the PSC regarding its calculation of the agency fee.

17) Exhibit 17 of the plaintiff's TAC is a true copy of an excerpt from the minutes of the PSC CUNY Welfare Fund Advisory Council Meeting of May 9, 2003, with markings added by the plaintiff to draw attention to a portion.

18) Exhibit 18 of the plaintiff's TAC is a true copy of an excerpt from the Minutes (dated April 1,2003) of the PSC Executive Committee meeting, with titles and markings added by the plaintiff to direct attention to a portion.

19) Exhibit 19 of the plaintiff's TAC is a true copy of letter of October 17, 2002 from the PSC to the plaintiff regarding his agency fee refund for the fiscal year 2000-2001.

20) SJM Exhibit A is a true copy of letter of April 15, 2004 from the PSC to the plaintiff regarding his agency fee refund for the fiscal year 2004-2005.

21) Plaintiff informed the PSC of his objection to its ideological expenditures for the fiscal years 1999/00, 2000/01, 2001/02, 2002/03, and 2003/04 in letters to the union of May 5, 1999, May 13, 2000, May 4, 2001, May 3, 2002, and May 1, 2003 respectively.

22) As of this date, the PSC has not returned any portion of the plaintiff's agency fee for the fiscal year 2002-2003.

23) Other than for fiscal year 2003/04, the only opportunity the union gave the plaintiff to go before an arbitrator came in September 2002, in response to the plaintiff's objection of May 2000 to ideological expenditures made in the 2000/01 fiscal year.

24) At a hearing before this court (9/30/02), the PSC conceded its failure to return any of the plaintiff's agency fee for 1999-2000.

25) The PSC returned $637.52 of the plaintiff's fee for 2000-2001 on October 17, 2002, but did not include interest on that sum.


Dated May 4, 2004
North Haven, CT

David Seidemann
Plaintiff, Pro Se

4

United States District Court
Eastern District of New York

---

DAVID SEIDEMANN
38 Garfield Avenue
North Haven, CT 06473
personally and in his capacity as
a member of the Brooklyn College faculty

       Plaintiff,
       -against-

                              **AFFIDAVIT IN SUPPORT OF**
                              **PLAINTIFF'S MOTION FOR**
                              **PARTIAL SUMMARY**
                              **JUDGMENT**
                              -CV- 02-3389 (SJ) (LB)

                              **Pro Se**

BARBARA BOWEN,
personally and in her capacity as
President of the PSC/CUNY (Professional Staff
Congress/City University of New York)
25 West 43rd Street
New York, NY 10036
(212) 354-1252

       and

PSC/CUNY
(Professional Staff Congress/City
University of New York)
25 West 43rd Street
New York, NY 10036
(212) 354-1252

       Defendants

---

BRYAN D. GLASS and CHRISTOPHER CALLAGY, co-counsels
Office of General Counsel
New York State United Teachers
52 Broadway, 9th Floor
New York, New York 10004
(212) 533-6300

1

I, David Seidemann, affirm that:

1) I am the plaintiff in the above-entitled action, and make this affidavit in support of plaintiff's motion for summary judgment.

2) The following facts are known to me to be true, of my own knowledge: The exhibits cited in the accompanying memorandum of law were those submitted with plaintiff's THIRD AMENDED COMPLAINT of January 19, 2004. These exhibits comprise true copies of the PSC's own documents, or answers to interrogatories, with occasional markings by the plaintiff to direct attention to portions of them. SJM Exhibit A is a true copy of a letter sent by the PSC. I informed the PSC of my objection to its ideological expenditures for the fiscal years 1999/00, 2000/01, 2001/02, and 2002/03 in letters to the union of May 5, 1999, May 13, 2000, May 4, 2001, May 3, 2002, and May 1, 2003 respectively. As of this date, the PSC has not returned any portion of the plaintiff's agency fee for the fiscal year 2002-2003. Other than for fiscal year 2003/04, the only opportunity the union gave the plaintiff to go before an arbitrator came in September 2002, in response to the plaintiff's objection of May 2000 to ideological expenditures made in the 2000/01 fiscal year. The PSC returned $637.52 of the plaintiff's fee for 2000-2001 on October 17, 2002, but did not include interest on that sum.

3) The foregoing facts are known to me to be true, of my own knowledge. I am competent to testify to such facts, would so testify if I appeared in court as a witness at the trial of the matter, and affirm them under penalty of perjury.

Dated May 4, 2004, North Haven, CT

_David Seidemann_
David Seidemann
Plaintiff, Pro Se

2

United States District Court
Eastern District of New York

---

DAVID SEIDEMANN
          Plaintiff,
          -against-

                                        **CERTIFICATE OF SERVICE**

                                        -CV- 02-3389 (SJ) (LB)
                                        **Pro Se**

BARBARA BOWEN,
personally and in her capacity as
President of the PSC/CUNY (Professional Staff
Congress/City University of New York)
          and
PSC/CUNY
(Professional Staff Congress/City
 University of New York)

                    Defendants

---

        I, DAVID SEIDEMANN, plaintiff *pro se*, do hereby certify that the
accompanying motion for summary judgment in the above-captioned action, and the
memorandum of law and attached exhibit, affidavit, and statement of undisputed facts in
support of that motion, was served upon opposing counsel by U.S. Mail, postage paid, at
the following address:

BRYAN D. GLASS and CHRISTOPHER CALLAGY, co-counsels
Office of General Counsel
New York State United Teachers
52 Broadway, 9th Floor
New York, New York 10004
(212) 533-6300

                                        *David Seidemann*

                                        DAVID SEIDEMANN
                                        38 Garfield Avenue
                                        North Haven, CT 06473
                                        May 4, 2004




**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE ® Post Office To Addressee

### ORIGIN (POSTAL USE ONLY)

| PO ZIP Code | Day of Delivery | Flat Rate Envelope |
|---|---|---|
| 10017 | ☑ Next ☐ Second | ☐ |

| Date In | | Postage |
|---|---|---|
| Mo. 5 Day 4 Yr 04 | ☑ 12 Noon ☐ 3 PM | $ |

| Time In | Military | Return Receipt Fee |
|---|---|---|
| 1047 ☐ AM ☐ PM | ☐ 2nd Day ☐ 3rd Day | |

| Weight | Int'l Alpha Country Code | COD Fee | Insurance Fee |
|---|---|---|---|
| 7 lbs. ozs. | | | |

| No Delivery | Acceptance Clerk Initials | Total Postage & Fees |
|---|---|---|
| ☐ Weekend ☐ Holiday | CH | $ 13.61 |

**FROM: (PLEASE PRINT)** PHONE ( 203 - 281 - 6631

DAVID SEIDEMANN
38 Garfield Avenue
North Haven, CT 06473

**FOR PICKUP OR TRACKING CALL 1-800-222-1811**
www.usps.com 〓EMS〓
PRESS HARD. You are making 3 copies.

### DELIVERY (POSTAL USE ONLY)

| Delivery Attempt | Time | Employee Signature |
|---|---|---|
| Mo. Day | ☐ AM ☐ PM | |

| Delivery Attempt | Time | Employee Signature |
|---|---|---|
| Mo. Day | ☐ AM ☐ PM | |

| Delivery Date | Time | Employee Signature |
|---|---|---|
| Mo. Day | ☐ AM ☐ PM | |

### CUSTOMER USE ONLY

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

WAIVER OF SIGNATURE (Domestic Only)
Additional merchandise insurance is void if waiver
of signature is requested.

☐ NO DELIVERY
☐ Weekend ☐ Holiday

**TO: (PLEASE PRINT)** PHONE ( 212 - 533-6300

Christopher Callagy/Bryan Glass
NYSUT, Office of the General Counsel
52 Broadway, 9th Floor
New York, NY

| 1 | 0 | 0 | 0 | 4 | + | 1 | 6 | 0 | 3 |
|---|---|---|---|---|---|---|---|---|---|


### UNITED STATES POSTAL SERVICE

```
***** WELCOME TO *****
      GRAND CENTRAL STA
      New York, NY 10017-3911
        05/04/04 10:47AM

Store USPS           Trans  65
Wkstn sys5022        Cashier KSYRPG
Cashier's Name       Charles
Stock Unit Id        SIACHARLES
PO Phone Number      18002758777
USPS #               3558250010

1. Exp. Mail PO-ADD          13.65
   Destination:    10004
   Weight:         7.00oz
   Postage Type:   PVI
   Total Cost:     13.65
   Base Rate:      13.65
   Label#:
   ER384100817US

Subtotal                     13.65
Total                        13.65

Cash                         20.00
Change Due
   Cash                       6.35

Number of Items Sold: 1

   Send your Valentines with LOVE
  "Buy Breast Cancer Stamps - today"
    Help Support Cancer Research
```