UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   OCT 0 8 2004   Rec'd

P.M.
TIME A.M.

DAVID SEIDEMANN,

Plaintiff,

-against-

CV 02 3389 (SJ)(LB)

BARBARA BOWEN, personally and in her capacity
as President of the PSC/CUNY and PSC/CUNY
(Professional Staff Congress/City University of
New York)

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

JAMES R. SANDNER
Attorney for Defendants
52 Broadway
New York, NY 10004
(212) 533-6300

CHRISTOPHER CALLAGY;
BRYAN D. GLASS,
Of Counsel.

.NYC-Legal:83630.1

**Table of Contents**

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT I

    THE UNION'S AGENCY FEE REFUND PROCEDURE SATISFIES THE *HUDSON* STANDARDS AND SHOULD BE UPHELD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT II

    ANY LEHNERT-TYPE VIOLATIONS IDENTIFIED BY PLAINTIFF LACK MERIT OR OTHERWISE HAVE BEEN REMEDIED PROSPECTIVELY . . . . . . . . . . . . . . . 7

POINT III

    DEFENDANTS' FINANCIAL DISCLOSURE TO AGENCY FEE PAYERS IS CONSTITUTIONALLY ADEQUATE AS DEFINED IN HUDSON . . . . . . . . . . . . . . 8

POINT IV

    PLAINTIFF FAILS TO STATE A CAUSE OF ACTION REGARDING BREACH OF DUTY OF FAIR REPRESENTATION IN HIS THIRD CLAIM FOR RELIEF AND THIS CLAIM IS OTHERWISE TIME-BARRED . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT V

    DEFENDANTS' AGENCY FEE REFUND PROCEDURE DOES NOT CREATE AN IMPERMISSIBLE BARRIER TO ARBITRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT VI

    DEFENDANTS' REQUIREMENT THAT AGENCY FEE PAYERS MAKE ANNUAL OBJECTIONS IS NOT CONSTITUTIONALLY IMPERMISSIBLE . . . . . . . . . . . . . 10

POINT VII

    DEFENDANTS' PRESENT PROCEDURE FOR PROVIDING FINANCIAL REPORTS TO FEE PAYERS IS NOT CONSTITUTIONALLY IMPERMISSIBLE . . . . . . . . . . . 11

POINT VIII

      DEFENDANTS HAVE RETURNED AN ADEQUATE PORTION OF THE
      PLAINTIFF'S AGENCY FEE FOR THE 2001-02 FISCAL YEAR .............. 11

POINT IX

      DEFENDANTS HAVE RETURNED A REBATE OF PLAINTIFF'S AGENCY FEE
      FOR THE FISCAL YEAR 2002/03 ...................................... 12

POINT X

      DEFENDANTS PROVIDED THE PLAINTIFF WITH A REASONABLY PROMPT
      OPPORTUNITY TO CHALLENGE THE AMOUNT OF THE AGENCY FEE BEFORE
      AN IMPARTIAL DECISIONMAKER .................................... 12

POINT XI

      DEFENDANTS DID NOT OBTAIN FROM PLAINTIFF AN INVOLUNTARY
      LOAN ........................................................... 13

CONCLUSION ......................................................... 14

## TABLE OF AUTHORITIES

### CASES

*Andrews v. Education Ass'n.,* 829 F. 2d 335 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Chicago Teachers Union v. Hudson,*475 U.S. 292, 106 S.Ct. 1066 (1986) . . . . . . . . . . . . . . 5, 12

*Lehnert v. Ferris Faculty Association*, 500 U.S. 507, 111 S.Ct. 1950 (1991) . . . . . . . . . . *passim*

*Price v. International Union, et al,* 927 F. 2d 88, 93 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Machinists v. Street,* 367 U.S. 740, 774, 81 S. Ct. 1784 (1961) . . . . . . . . . . . . . . . . . . . . . . . . 10

### STATUTES

CPLR § 217(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DAVID SEIDEMANN,

        Plaintiff,

       -against-                   CV 02 3389 (SJ)(LB)

BARBARA BOWEN, personally and in her capacity
as President of the PSC/CUNY and PSC/CUNY
(Professional Staff Congress/City University of
New York)

        Defendants.

---

## PRELIMINARY STATEMENT

This memorandum of law is submitted in support of defendants' cross-motion for summary judgment and in opposition to plaintiff's summary judgment motion, dated May 4, 2004.

Plaintiff *pro se* filed his instant Third Amended Complaint to challenge defendant PSC's existing agency fee refund procedure, which is annexed as Exhibit 15 to the Third Amended Complaint. In his Third Amended Complaint, he has pled 10 causes of action. As set forth below, plaintiff fails to state a constitutionally cognizable cause of action on his challenges to the present PSC procedure. Moreover, his remaining causes of action are moot because (1) plaintiff has been or will be reimbursed in full for all agency fee payments to remedy any past problems with the procedure and/or application of PSC agency fee procedures, and (2) as set forth in the accompanying Affidavit of Deborah Bell, application of the PSC policy has been modified prospectively to address plaintiff's remaining concerns. Thus, summary judgment should be granted on behalf of defendants at this juncture and plaintiff's motion for summary judgment should be denied.

## STATEMENT OF FACTS

On January 19, 2004, plaintiff *pro se* filed his Third Amended Complaint in this action, alleging that defendants violated his constitutional rights by application of its agency fee refund procedure. The present agency fee refund procedure is annexed as Exhibit 15 to the Third Amended Complaint. Plaintiff's Third Amended Complaint contains 10 causes of action, which are addressed *in seriatim* below.

Initially it must be noted that there is no basis to sue PSC President Barbara Bowen in her individual capacity, as plaintiff has failed to sufficiently allege her personal knowledge of the circumstances herein.

It is also noteworthy that plaintiff has not sought nor obtained class action status in this case, so he does not have standing to object on behalf of other agency fee payers within the PSC.

Over the course of this litigation the parties adjusted their respective positions regarding the agency refund procedure in question and its implementation. Deborah E. Bell, the Executive Director of defendant Professional Staff Congress ("PSC"), in her affidavit annexed hereto relates that the PSC amended its agency refund procedure as a consequence of this litigation and describes in detail the reasons for its past practice regarding agency fee objection. *See passim* Bell Affidavit.

In the past the PSC had relied on its now retired Legal Director, Nicholas Russo, to handle the agency fee refund procedure. *Id.* ¶ 3. To Executive Director Bell's knowledge, the only arbitration of an agency fee objector's claim in the history of the PSC resulted in a decision and award favorable to the PSC's broad understanding of its discretion in matters relating to the chargeability to nonmembers of union expenditures. *Id.* ¶ 5.

After consultation with counsel, the PSC has amended its agency refund procedure and the manner of its implementation to reflect the current state of the law. *Id.* ¶¶ 8-10. Now, agency

fee objectors will have an estimated amount of rebatable fees returned to them in advance of any audit, and sufficient information will be provided to potential objectors prior to the month-long period set aside each year for filing an objection. In this way objectors will receive a *pro rata* refund and they will no longer be required to wait until the precise amount of rebatable monies is determined through the annual audit. *Id.* ¶¶ 11-12.

Executive Director Bell states in her affidavit both that she is aware of the holding in *Lehnert v. Ferris Faculty Association*[1], that the so-called free-rider concern is inapplicable where lobbying extends beyond the effectuation of a collective bargaining agreement and unnecessarily interferes with a dissenter's free speech rights and that all prospective decisions regarding the chargeability of union expenditures will be made according to the principles announced in *Lehnert. Id.* ¶¶ 15-17.

Further, Executive Director Bell states that the PSC will refund Plaintiff's entire agency fee amount for 2001-2002, 2002-2003, and 2003-2004 school years, in an effort to resolve the instant proceeding.[2] *Id.* ¶ 18.

Throughout the instant proceeding the PSC has demonstrated its good faith in handling any and all of Plaintiff's concerns regarding its policies and practices at issue. Indeed, Executive Director Bell affirms that the PSC will deal fairly and equitably with any and all of Plaintiff's concerns now and in the future. *Id.* ¶ 21.

Since the PSC will have refunded all of Mr. Seidemann's agency fees that could possibly be at issue in this matter, and since the PSC has acted in good faith to conform its practices and procedures to the current state of the law, there is no legitimate basis to question the good faith of the PSC going forward in its administration of all things agency fee. *Id.* ¶ 22.

_____

[1]500 U.S. 507, 111 S.Ct. 1950 (1991)

[2]The PSC is in the process of cutting the refund checks and expects that adminsitrative act to have been completed by the time this motion is before the Court for decision.

Given the imminent refund of any and all monies at issue, and the PSC's affirmation of the *Lehnert* standards, there is no genuine issue of material fact before the Court.

## POINT I

### THE UNION'S AGENCY FEE REFUND PROCEDURE
### SATISFIES THE *HUDSON* STANDARDS AND SHOULD BE UPHELD.

It is axiomatic that all members of a bargaining unit have an obligation to contribute financially to the administration of its own collective bargaining agreement regardless of the ideological variety obtaining within any given unit. To hold otherwise grants safe harbor to the so-called free-rider who enjoys all the benefits of other people's work without ever having to contribute to it. In an effort to balance the rights of individuals to withhold contribution to ideological causes they oppose against the rights of unions to receive support for the unit-wide work which they perform, courts have required unions to develop safeguards for the objecting nonmember.

When a union's plan satisfies the standards established by United States Supreme Court in *Chicago Teachers Union v. Hudson*[3], however, the plan should be upheld even in the face of plausible less restrictive alternatives proposed by agency fee objectors. *Andrews v. Education Ass'n.*[4] *Hudson* simply requires that unions provide an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of fee before an impartial arbiter, and an escrow of the amounts reasonably in dispute pending the challenge. *Id.*[5]

Contrary to Plaintiff's claims and assertions as embodied in his third amended complaint, unions are under no obligation to realize his idiosyncratic refund plan which would impose new and unprecedented burdens upon Defendants. As the Unites States Supreme Court in *Hudson* held, "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses as

---

[3]475 U.S. 292, 106 S.Ct. 1066 (1986).

[4]829 F. 2d 335 (2d Cir. 1987).

[5]829 F. 2d 335, 339.

well as verification by an independent auditor."[6]

Here, the PSC agency refund procedure - as amended - provides objectors with sufficiently detailed information and/or access to it to enable a nonmember to register an objection to the amount of fee. *See* Exhibits 1 - 5 of Plaintiff's Third Amended Complaint. Among materials available to an agency fee objector are the relevant PSC budgets and audits which include, *inter alia*, a breakdown of union expenditures and an analysis of chargeable and non-chargeable expenses for purposes of nonmember objection. *Id.*

Indeed, the gravamen of Plaintiff's third amended complaint seems to be that nonmembers are asked to visit the union's website in order to review certain of the financial materials relevant to their decision whether or not to object to the union's fee calculation. *See* pp. 2-3 of the Third Amended Complaint. Whereas a union may not raise a cost defense to an otherwise impermissible infringement upon a nonmembers constitutional rights, a nonmember should not be permitted to raise a druthers defense every time they disagree with an otherwise legal union plan.

Directing a nonmember to a website for the express purpose of assisting that nonmember in reaching a decision regarding agency fee, is no more burdensome - if at all - than stuffing the nonmember's mailbox with a thick packet of financial materials. Clearly, Plaintiff bears some responsibility for reading and interpreting the information provided by the union. Given the fact that Plaintiff is a university professor, it is difficult to understand how recourse to a website poses an impermissible obstacle to the exercise of his constitutional rights.

The *Hudson* mandate simply does not require the union to relieve nonmember objectors of their responsibility to formulate a reasonable objection. Plaintiff fails to raise a single factual issue to support his contention that access to the union website somehow hampers his ability to

---

[6]475 U.S. 292, 307, 106 S.Ct. 1066, 1076 n. 18.

do so. Since Defendants amended their agency refund procedure to comply with *Hudson* and its progeny, its plan should be upheld notwithstanding Plaintiff's ongoing dissatisfaction with aspects of it.

## POINT II

### ANY LEHNERT-TYPE VIOLATIONS IDENTIFIED BY PLAINTIFF LACK MERIT OR OTHERWISE HAVE BEEN REMEDIED PROSPECTIVELY.

Plaintiff alleges that defendant PSC compels objectors to pay the costs for activities that are non-chargeable to objecting fee payers, such as for (1) lobbying designed to secure funds for public education and other political issues; (2) public rallies, picket lines, concerts, and letter writing campaigns; (3) public relations activities; (4) reports in the PSC newspaper concerning nonchargeable activities; (5) reports on the PSC website concerning nonchargeable expenses; (6) campus based activities; (7) salary expenses; (8) expenses charged to objectors calculated based on nonchargeable salary expenses; (9) legal costs; and (10) AFT and NYSUT nonchargeable expenses. Complaint ¶ 25.

As set forth in the accompanying affidavit of Deborah E. Bell (hereinafter "Bell Affidavit"), to the extent any *Lehnert* problems existed in application of PSC procedures, they have been remedied prospectively. Moreover, plaintiff has been or will soon be reimbursed in full for his past agency fee contributions. Thus, this cause of action is entirely moot at this juncture.

The mootness exception also does not apply herein. Plaintiff merely seeks a declaratory judgment at this juncture before ascertaining any present problems in application of the existing PSC procedure.

## POINT III

### DEFENDANTS' FINANCIAL DISCLOSURE TO AGENCY FEE PAYERS IS CONSTITUTIONALLY ADEQUATE AS DEFINED IN HUDSON

Plaintiff alleges that defendant PSC has failed to provide potential objectors with sufficient information to gauge the propriety of the PSC's fee, and that the lack of informatoin has been used to hide expenditures that were improperly charged to objectors. Complaint ¶ 124.

To the extent that the PSC's financial disclosure was inadequate in the past, this is now a moot issue given changes to the agency fee procedure through the course of this litigation. As plaintiff has been made whole by return of his entire agency fee, he has not been harmed by inadequate disclosure in the past, and disclosure will be remedied prospectively.

## POINT IV

### PLAINTIFF FAILS TO STATE A CAUSE OF ACTION REGARDING BREACH OF DUTY OF FAIR REPRESENTATION IN HIS THIRD CLAIM FOR RELIEF AND THIS CLAIM IS OTHERWISE TIME-BARRED

Plaintiff appears to allege in his third cause of action a state law claim for breach of the duty of fair representation by claiming that the PSC willfully hides nonchargeable expenses as chargeable. Complaint ¶¶ 151-154.

To the extent that plaintiff alleges bad faith violations in the past, they are barred by the applicable four month statute of limitations set forth in CPLR § 217(2). To the extent that any bad faith claim could be considered timely, plaintiff has utterly failed to explain his rationale why any PSC action was willful, which is wholly inconsistent with PSC's cooperative efforts in this litigation to remedy any deficiencies in its agency fee procedure.

As set forth in the Bell Affidavit, and as the Court has noted in the past, the PSC has been cooperative throughout this litigation and has exerted good faith attempts throughout to ensure

that its agency fee procedure and the application thereof are in full compliance with the law.

Moreover, the Second Circuit in *Price v. International Union, et al.*[7], held that where a union's figures may be subsequently reviewed by an independent arbitrator - as is the case here - there is no basis to infer irrationality or bad faith in the use of the procedures employed by the union.  Hence, Plaintiff's is hoist on his own petard since even the unamended agency fee refund procedures employed by the PSC prior to this litigation provided for an independent arbitration of each and every agency fee dispute.

Now, given the amendment of the PSC agency refund procedure and the renewed understanding of the PSC's obligations to safeguard the constitutional rights of nonmembers, *see passim* Bell Affidavit, there is no factual basis to support a charge of bad faith on the part of Defendants.

Indeed, Plaintiff's entire bad faith argument rests on the spurious assumption that mistakes and/or misunderstandings in the past implementation of the agency fee refund procedure can only find adequate explanation in the heady notions of conspiracy and underhandedness.  It is precisely because this area of law lends itself to disagreement that courts have consistently held that arithmetic precision is not required in the calculation of chargeable union expenditures.  Moreover, in *Price* the Second Circuit, citing *Andrews*, held that the audit of union expenditure need only verify that expenditures were made and relieved the auditing process of the burden of determining the appropriateness of the allocation to chargeable and non-chargeable categories.[8]

---

[7]927 F. 2d 88, 93

[8]927 F. 2d 88, 93

## POINT V

### DEFENDANTS' AGENCY FEE REFUND PROCEDURE DOES NOT CREATE AN IMPERMISSIBLE BARRIER TO ARBITRATION.

Plaintiff alleges that the PSC agency fee refund procedure creates an impermissible barrier to arbitration because the objecting agency fee payer must indicate to the PSC the percent of agency fees which he or she believes in dispute. Complaint ¶ 178.

Plaintiff does not articulate why this requirement is unduly burdensome, or any applicable case precedent in particular which supports the bald assertion that this minimal notice requirement unduly violates his constitutional rights.

## POINT VI

### DEFENDANTS' REQUIREMENT THAT AGENCY FEE PAYERS MAKE ANNUAL OBJECTIONS IS NOT CONSTITUTIONALLY IMPERMISSIBLE.

The United States Supreme Court has already held that while a nonmember's burden is imply to make an objection known to the union, dissent, itself, is not to be presumed by the union and must be affirmatively made known to the union by the dissenting employee. *Machinists v. Street*.[9]

Plaintiff alleges that the PSC agency fee refund procedure violates his First Amendment constitutional rights because an agency fee payer is required to object annually to ideological expenditures. Complaint ¶ 184.

Plaintiff utterly fails to state a cause of action herein and offers absolutely no support for this assertion. Indeed, were the PSC to presume annually and automatically that Plaintiff - or any other agency fee payer for that matter - objected to certain union expenditures, the PSC would be guilty of the very violation herein charged: usurping the right of a nonmember to object or

---

[9] 367 U.S. 740, 774, 81 S. Ct. 1784 (1961)

acquiesce to certain union expenditures. While Plaintiff seeks to assert his present ideological

objections in perpetuity, Defendants decline to exercise a nonmembers prerogative prematurely.

No court has ever found such a requirement to violate the First Amendment.

## POINT VII

### DEFENDANTS' PRESENT PROCEDURE FOR PROVIDING FINANCIAL REPORTS TO FEE PAYERS IS NOT CONSTITUTIONALLY IMPERMISSIBLE

Plaintiff alleges that the PSC agency fee refund procedure impermissibly burdens his First

Amendment constitutional rights because of PSC's requirement that he log on to the PSC

website or call its office to obtain financial data rather than just be given the data. Complaint ¶

193.

Plaintiff utterly fails to state a cause of action herein and offers absolutely no support for

this assertion.

## POINT VIII

### DEFENDANTS HAVE RETURNED AN ADEQUATE PORTION OF THE PLAINTIFF'S AGENCY FEE FOR THE 2001-02 FISCAL YEAR

Plaintiff alleges that the PSC's agency fee calculation was inadequate for Fiscal Year

2001-2002 because several chargeable expenses were mischaracterized and thus that he is

entitled to a larger refund for that fiscal year. Complaint ¶ 197-198.

This cause of action is moot because PSC has refunded or shortly intends to refund his

entire agency fee for that fiscal year, as explained in the accompanying Bell Affidavit.

## POINT IX

### DEFENDANTS HAVE RETURNED A REBATE OF PLAINTIFF'S AGENCY FEE FOR THE FISCAL YEAR 2002/03

Plaintiff alleges that the PSC failed to provide plaintiff with a rebate for any part of his agency fee for fiscal year 2002-03 despite his timely objection to the PSC's ideological expenditures.

This cause of action is moot because PSC has refunded his entire agency fee or shortly intends to refund his entire agency fee for that fiscal year, as explained in the accompanying Bell Affidavit.

## POINT X

### DEFENDANTS PROVIDED THE PLAINTIFF WITH A REASONABLY PROMPT OPPORTUNITY TO CHALLENGE THE AMOUNT OF THE AGENCY FEE BEFORE AN IMPARTIAL DECISIONMAKER

Plaintiff alleges that the PSC failed to provide plaintiff with a reasonably prompt opportunity to challenge the amount of the agency fee before an impartial decisionmaker. Complaint ¶ 210.  Plaintiff clearly references herein the second procedural prong of the U.S. Supreme Court's decision in *Chicago Teachers Union v. Hudson*.[10]

This cause of action is moot because PSC has refunded his entire agency fee for that fiscal year during the course of this litigation, and the new agency fee refund procedure ensures for prompt arbitration in the future.

---

[10]475 U.S. 292, 106 S.Ct. 1066 (1986).

## POINT XI

## DEFENDANTS DID NOT OBTAIN FROM PLAINTIFF AN INVOLUNTARY LOAN

Plaintiff alleges that the PSC impermissibly had obtained an involuntary loan for the Fiscal Years 1999-2000 and 2000-2001 because it had used his money for ideological purposes before the money was refunded and the money was not refunded to him with interest.  Complaint ¶ 222.

This cause of action is moot because PSC now has refunded or intends to refund plaintiff's entire agency fee for the Fiscal Years 1999-2000 and 2000-2001, with interest, as explained in the accompanying Bell Affidavit.

In any event, the Second Circuit in *Andrews*, citing *Hudson*, finds that holding an objector's fee in escrow satisfies all constitutional concerns.  Were Plaintiff correct in his assertion that waiting for his refund constitutes an impermissible loan, than arguably *Hudson* itself is wrong since the court permits unions to merely set aside the agency fees at issue until such future time when the appropriateness of the allocation may be determined.

To wit, there is nothing wrong with placing disputed agency fees into escrow, or as here, refunding them on a *pro rata* basis until the auditing process runs its useful course.

## **CONCLUSION**

Based on the foregoing, it is respectfully requested that defendants' cross-motion for summary judgment be granted in its entirety and plaintiff's motion for summary judgment be denied in its entirety, together with such other and further relief that the Court deems just and proper.

Dated: New York, New York
       July 12, 2004

                                    Respectfully submitted,

                                    JAMES R. SANDNER
                                    Attorney for Defendant UFT
                                    52 Broadway
                                    New York, NY 10004
                                    (212) 533-6300

BY:                                _____
                                    CHRISTOPHER CALLAGY
                                    Of Counsel

EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————

DAVID SEIDEMANN,

                    Plaintiff,

                                                    **AFFIDAVIT IN**
                                                    **SUPPORT OF MOTION**
                                                    **FOR SUMMARY JUDGMENT**

          -against-
                                                    CV-01-3389 (SJ)(LB)
                                                    (Johnson, J.)
BARBARA BOWEN, personally and in her                (Bloom, M.J.)
capacity as President of the PSC/CUNY and
PSC/CUNY (Professional Staff Congress/City
University of New York),

                    Defendants.

—————————————————————————

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NEW YORK)

          DEBORAH E. BELL, being duly sworn, hereby deposes and says as follows:

          1.        I am the Executive Director of defendant Professional Staff Congress ("PSC") and

familiar with the facts and circumstances of this case.  Among my varied duties as Executive

Director, I am responsible for the implementation of PSC policy regarding agency fee payers.

This implementation includes determinations of whether particular union expenditures are

chargeable to agency fee payers, and the overall administration of the agency fee refund

procedure. *See* Agency Fee Refund Procedure, a copy of which is annexed hereto as Exhibit 1.

          2.        I submit this affidavit in support of defendants' motion for summary judgment

and in opposition to plaintiff's motion in the above captioned matter.

3.     For many years the agency fee refund procedure within the PSC was handled by Nicholas Russo, our former legal director, who retired last year after decades of dedicated service to the union.

4.     It is my understanding that there were relatively few challenges to agency fee refunds over the years and that the PSC had simply opted to refund a challenger's entire fee rather than expend precious union resources in the arbitration of any such claim.

5.     Indeed, the one arbitration decision regarding agency fee refund gave the PSC broad discretion in determining whether a particular union expense was chargeable to agency fee payers. *See Matter of The Professional Staff Congress City University of New York and Agency Fee Rebate, Fiscal Year 1978-79 (Professor Howard H. Lentner)*, a copy of which is annexed hereto as Exhibit 2.

6.     During the course of this instant litigation, the PSC has reviewed its policy and practice regarding agency fee refunds.  The review of the PSC's implementation of its agency fee refund procedure has continued through recent months particularly given the transition from Mr. Russo to me, and the continuing advice of counsel in hopes of reaching final resolution of the case.

7.     In the one arbitration cited above, Arbitrator Norman Brand upheld the PSC's determination that a wide range of expenses were more than incidentally related to the terms and conditions of employment and thus chargeable to agency fee payers.  Among other things, these included certain advertising campaigns aimed at preserving enrollment levels in the hope of saving bargaining unit jobs, a lobbying effort to extend the agency fee statute itself, as well as

most of the expenditures relating to the union's newspaper, The Clarion, save those of an ideological nature such as efforts to get out the vote in local elections. *See passim* Exhibit 2.

8.     It was my impression, therefore, that the PSC's discretion in determining chargeability to agency fee payers was broad enough to encompass a range of "political" activity provided that the union's efforts were not overtly ideological in nature.

9.     After consultation with counsel, and a diligent review of our practices and procedures in this regard, it is clear to me that in the intervening years from Arbitrator Brand's decision until now that the courts have narrowed the range of chargeable activity in a manner more solicitous of the objecting agency fee payer.

10.     Indeed, the PSC Delegate Assembly has amended our agency fee refund procedure to reflect the current state of the law. *See* Exhibit 1.

11.     Our new procedure provides, in part, that agency fee objectors will have an estimated amount of rebatable fees returned to them in advance of our own internal fiscal audit. Moreover, the objector will receive information sufficient for an informed objection prior to the month-long objection period running from May 1 to May 31 of each year. This so-called advance reduction method assures all agency fee payers going forward will receive a *pro rata* refund and they will no longer be required to wait until the precise amount of rebatable monies is determined through the auditing process.

12.     In addition, the PSC recognizes the need to include among the materials sent to agency fee payers sufficient information to direct them to the union's website where a variety of audit and budgetary information is readily available to them.

13.     Finally, arbitration before a neutral party is still available to any objector who for whatever reason does not accept the calculation of rebatable fees for any given year.

14.     The PSC remains committed to the application of all applicable laws in its internal calculation of agency fee payer rebates.  Specifically, the PSC acknowledges that any and all expenditures that are merely incidentally related to the terms and conditions of bargaining unit employment are not chargeable to agency fee payers and must be rebated to them.  Such non-chargeable expenditures would include lobbying efforts unrelated to the collective bargaining agreement, public rallies and other union-sponsored events which are ideological in nature and insufficiently related to the administration of the collective bargaining agreement and its successors to justify charging agency fee payers, public relations efforts and Clarion articles concerning non-chargeable activities, as well as union salary costs attributable to such non-chargeable matters.

15.     Further, I am aware that the United States Supreme Court in *Lehnert v. Ferris Faculty Association,* 500 U.S. 507, 111 S.Ct. 1950 (1991), has held that while nonunion workers should not be given a free ride on the dues-paying members of the bargaining unit, the so-called free-rider concern is inapplicable where lobbying extends beyond the effectuation of a collective bargaining agreement, and unnecessarily interferes with a dissenter's free speech rights.  *Id.,* 500 U.S. at 521-22, 111 S.Ct. at 1960-61.

16.     All prospective decisions regarding the chargeability of union expenditures to agency fee payers will be made according to the principles announced in *Lehnert* and its

progeny, with the understanding that no amount of union sensitivity or foresight towards the

legitimate concerns of agency fee objectors can prevent potential disputes over such decisions.

17.     The PSC remains confident that its agency fee refund procedure, as amended,

protects the rights of any and all future agency fee objectors.

18.     In light of the PSC's decision in the instant case to fully refund with interest Mr.

Seidemann's agency fees for the 2000-2001 school year, *see* a copy of the letter and refund check

annexed hereto as Exhibit 3, the PSC now refunds Mr. Seidemann's remaining fees for the 2001-

2002, 2002-2003, and 2003-2004 school years.

19.     I am confident that the good faith demonstrated by the PSC throughout this

litigation, along with its renewed understanding of the obligations imposed by legal precedents,

stands the PSC in good stead with this Court.

20.     The PSC remains committed to respecting the rights of all its bargaining unit

members, including its agency fee payers and objectors.

21.     The PSC affirms its intention to deal fairly and equitably with any and all of Mr.

Seidemann's concerns now and in the future regarding the union's determination of what is a

lawful chargeable expense of his agency fee, and indeed, for any concerns which he may have

touching on the mission of the PSC.

22.     Since the PSC has refunded all of Mr. Seidemann's agency fees that could

possibly be at issue, and since the PSC has acted in good faith to conform its practices and

procedures to the current state of the law, there is no legitimate basis to question the good faith of

the PSC going forward in its administration of its agency fee refund procedure.

WHEREFORE, your affiant respectfully submits that summary judgment be granted in

favor of defendants.

DEBORAH E. BELL
Executive Director for PSC
25 West 43rd Street
New York, New York 10036
(212) 354-1252

Sworn to before me this 1st
___ day of July, 2004

Notary Public

CLARISSA GILBERT WEISS
NOTARY PUBLIC, State of New York
No. 01WE4877704
Qualified in Queens County
Commission Expires November 24, 20___

EXHIBIT "1"

# AGENCY FEE REFUND PROCEDURE

New York State Civil Service Law, Chapter 606, Laws of 1992, was amended to provide for mandatory agency shop fee deductions. In accordance with the amendment, your local, the Professional Staff Congress/CUNY, will be making agency fee deductions in an amount equivalent to union dues, as provided in this procedure.

Pursuant to Chapter 677, Laws of 1977, (as amended by Chapter 678, Laws of 1977 and Chapter 122, Laws of 1978), any person making agency fee payments to the union has the right to object to the expenditure of any part of the agency fee that represents that employee's *pro rata* share of expenditures by the union and its affiliates in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment.

Such an objection, if any, shall be made by the fee payer ("the objector") individually notifying the union local's president of her/his objection only during the period between May 1st and May 31st of the year prior to the beginning of the fiscal year to which the objection pertains. The union's fiscal year commences on September 1st.

For those CUNY employees making agency fee payments to the Union in the fall semester of the fiscal year for which the refund is being sought *but who were not employed by CUNY during the month of May prior to the fiscal year at issue*, there shall be a re-opening period – between November 1 and 30 – during which they may file objections in the same manner as above.

Prior to the objection periods, the union will make available information as to the prior year's rebatable expenditures.

If such objection is made, the objector's agency fee for the next fiscal year will be reduced by the projected *pro rata* amount of expenditures for such political and ideological purposes based on the latest fiscal year's information for which there is a completed and available audited financial statement. The objector will be provided at the beginning of the new fiscal year with an advance payment equal to the amount of the reduction, together with an explanation as to how such a projected amount was calculated.

If the objector is dissatisfied with the amount or appropriateness of the advance reduced amount, s/he may appeal that determination in writing and send it to the union local's president by U.S. Mail within thirty-five (35) calendar days following the union's mailing of the advanced payment amount. The question of the adequacy of the advance payment thereafter will be submitted by the union to a neutral party appointed by the American Arbitration Association for an expeditious hearing and resolution in accordance with its rules for agency fee determinations. The costs for any appeal to a neutral party under this procedure shall be borne by the union.

--continued--

1

The union, at its option, may consolidate all appeals and have them resolved at one proceeding held for this purpose. The objector may present her/his appeal in person or in writing.

As soon as they are available after the close of the union's fiscal year, the union will provide copies of the audited financial statements to the objector, including the final refund determination for the fiscal year at issue.

If the objector is dissatisfied with the amount or appropriateness of the amount of the final determination, s/he may appeal that determination in writing and send it to the union local's president by U.S. Mail within thirty-five (35) calendar days following the union's mailing of the advice regarding the amount of the final determination. At that time the objector must indicate to the union local president the percent of agency fees that s/he believes is in dispute. The question of the adequacy of the amount of the final determination thereafter will be submitted by the union to a neutral party appointed by the American Arbitration Association for an expeditious hearing and resolution in accordance with its rules for agency fee determinations. The costs for any appeal to a neutral party under this procedure shall be borne by the union.

Adopted by the PSC Delegate Assembly on February 27, 2003.

2

EXHIBIT "2"

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| The Professional Staff Congress ) | Case #1330 |
| City University of New York ) | 0086 81 |
| ) | |
| and ) | Decision of the |
| ) | Neutral |
| Agency Fee Rebate, Fiscal Year ) | |
| 1978-1979 (Prof. Howard H. Lentner) ) | |

Before:  Norman Brand, Neutral

Appearances:  Professional Staff Congress ("PSC"), Nancy E. Hoffman, Esq.,
D. Nicholas Russo, Esq.; Agency Fee Objector,
Professor Howard H. Lentner

Background:

On February 18, 1981, I was notified by the American Arbitration
Association ("AAA") of my appointment as neutral in this matter, in
accordance with the procedures of the PSC (J-1).  A hearing was held at
the offices of the American Arbitration Association, in New York City,
on March 18, 1981.  At the close of the hearing on that day the
parties were given the option of scheduling an additional day of
hearing related to the union's newspaper, The Clarion.  On May 8,
1981, as a result of correspondence from the parties which I received
through AAA, I held a conference call during which we scheduled an
additional day of hearing for June 10, 1981.  At both hearings the
parties were given a full opportunity to examine and cross-examine
witnesses, present evidence, and argue in behalf of their respective
positions.  Briefs and reply briefs were filed by the parties.

ISSUE:

At the hearing the parties stipulated the following issue:

>Was the $2.11 of deducted agency shop fees refunded
>to the Appellant equal to his pro-rata share of
>Professional Staff Congress expenditures made during
>PSC's fiscal year ending August 31, 1979 in aid of
>activities or causes of a political or ideological
>nature only incidentally related to the terms and
>conditions of employment?

>If not, what should the remedy be?

DISCUSSION:

The Statute

In assessing whether the union made expenditures for purposes which require refunds, it is necessary to give effect to the words of the statute.  The statute requires, as a condition of receiving agency shop fees, that the union establish and maintain a procedure for refunding to objectors their:

> [p]ro rata share of expenditures by the organization in aid of causes of a political or ideological nature only incidentally related to terms and conditions of employment.  [N.Y. Civ. Serv. Law §208.3(a) (McKinney)]

To my knowledge, the statute has had no definitive interpretation by the New York courts.  Nor did any relevant legislative history in the form of legislative or gubernatorial memoranda, accompany the statute.  (See, 1977 N.Y. Laws and 1978 N.Y. Laws)  Thus, in construing the statute for the purpose of this proceeding I must look solely to the words of the statute itself while being mindful of Abood v. Detroit Board of Education, 431 U.S. 209.

The statute creates three tests to determine if a union expenditure is refundable.  First, does it aid a political cause or activity?  The ordinary dictionary definition of "political" as "Of or relating to government . . . involving politics and esp. party politics" (Webster's Seventh New Collegiate Dictionary 657), provides an adequate basis for understanding how the word is used in the statute.  While PSC argued that I should read the word "partisan" into the statute, before the word "political," there is no warrant for doing so.  Nor does it help clarify the statute to do so.  For instance, if the union were to aid a non-partisan effort to have voters approve a constitutional change to permit casino gambling, this aid would not be immunized from further scrutiny simply because it was not partisan.  Rather, it would still have to be demonstrated that this aid was more than "only incidentally

related to terms and conditions of employment." Neither can I accept Professor Lentner's view that involvement in the internal political processes of NYSUT and AFT are prohibited by the statute.  If PSC can affiliate (as discussed below) it can participate in the incidents of affiliation.

If the expenditure is not "political," the second test is:  Does it aid an activity or cause of an ideological nature?  Again, the ordinary dictionary definition of "ideological" as pertaining to "the integrated assertions, theories, and aims that constitute a sociopolitical program" (Webster's Seventh New Collegiate Dictionary 413) is adequate.  If the expenditure does not aid an activity or cause of a political or ideological nature, it is not refundable.  If it aids either, a third test must be applied:  Is the expenditure "only incidentally related to terms and conditions of employment?" This test sets up a category ("terms and conditions of employment") and a relationship ("only incidentally"), each of which must be considered separately.

"Terms and conditions of employment" has both a technical and a general meaning.  The Taylor Law contains a technical definition:

> The term 'terms and conditions of employment' means salaries, wages, hours, agency shop fee deductions and other terms and conditions of employment. . . [it] shall not include. . . any benefits provided by [N.Y. Civ. Serv. Law §201.4 (McKinney)]

This definition is not wholly adequate for the present inquiry for two reasons:  it is tautological and it excludes an area of obviously legitimate union activity (retirement benefits) which it is inconceivable the legislature intended to forbid the expenditure of objectors' money on.  An example may be helpful in explaining the point.

If the statutory definition were to prevail, the following result could occur.  If the union were to expend objectors' money on successfully

lobbying for the passag of enabling legislation for a contract
containing a 10% wage increase, no refund would be required.  If,
on the other hand, the union were to expend objectors' money on succesfull
lobbying for a 10% increase in retirement benefits, a refund would be
required.  In both instances a substantial benefit accrues to
bargaining unit employees.  In both instances the benefit accrues as a
result of the employment relationship.  Yet in the second instance
objectors' money may not be used.  I can not assume the legislature
intended so absurd a result; therefore, the narrow statutory definition
can not be controlling.  That is, while it must be considered to define a
portion of the area covered, it does not define its limits.

The most likely assumption is that the legislature intended that
"terms and conditions of employment" be construed more broadly for the
purpose of the agency fee section of the statute.  Constistent with
Abood, a broad definition would encompass those matters which affect
an employee as a result of his or her employment relationship.  The
key here is that the employment relationship must provide the nexus
between the employee and the matter sought to be included within the
definition.  This definition is consistent with PSC's argument that
"ideological" is to be qualified by asking whether the expenditure in
an "ideological area" primarily benefits society as a whole or the
employees represented by the union.  (Brief, at 19)  On the other hand,
it is narrower than the PSC definition in that it requires the employment
relationship to furnish the nexus between the employees represented
and the ideology.  Thus, even if the majority of PSC's members were
Hungarian-Americans, support of a group demanding reparations from
Russia for Hungarian-Americans who fled the Russian invasion would be
rebatable.  Having defined the category "terms and conditions of
employment," I must examine the relationship--"only incidentally"--
which the statute sets up.

A useful definition of "incidental" is found in the dictionary, where it is defined as "occuring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part." (1 Compact Edition of the Oxford English Dictionary 1404) "Only" is defined as a word of limitation, "solely, merely, exclusively." (1 Compact Edition of the Oxford English Dictionary 1991) Combining the two definitions, I take the phrase "only incidentally" to limit the use of objectors' funds to those matters which may be political or ideological but are essentially or substantially related to terms and conditions of employment in the broad sense. For example, if the union were to contribute to the campaign of a legislator who voted favorably to the union on labor matters, I would consider that relationship too attenuated to permit the use of agency fee objectors' funds.

In its brief PSC also argues that the proper test for ideological expendures is whether the expenditure is "germane to or benefit[s] the union's constituency. . . ." (Brief, at 19)  This is too broad a reading in that it fails to give meaning to the "only incidentally" language of the statute.  Thus, in my view, an expenditure which may be characterized as "germane" or "related" to terms and conditions of employment is not necessarily excluded from the category of refundable items.  Rather, the expenditure must be essentially or substantially related to terms and conditions of employment.

One more consideration seems germane.  The union, at all levels, acts as a collectivity; its strength is the strength of numbers.  The stronger the union is as a whole, the more capable it is of achieving its collective bargaining goals in each of its constituent bargaining units.  Thus, although an individual institutional expenditure may not be directly related to the terms and conditions of employment of

bargaining agent.  He indicated that the power of PSC was not sufficient, absent affiliation with the larger organizations, to protect the jobs of its members from elimination.  Moreover, it is indisputable that unions gain their bargaining power through the strength of numbers.  It is through these very affiliations that PSC gains the ability to successfully influence legislation favorable to the employees it represents, and to engage in meaningful collective bargaining.  Thus, the objection to the overall amount expended on affiliation must be denied.

At the hearing I ruled that I would go no further than PERB in requiring PSC to produce evidence of the amounts properly rebatable from affiliates.  At that time, the requirements of PERB were met by a statement similar to U-4.  (see United University Professions, Inc. and Morris Eson (U-2951) September 15, 1978.)  A later determination, UUP and Thomas Barry (U-4229, November 11, 1980) was on appeal. Professor Lentner points out that in Hampton Bays Teacher Association and Francis L. Sullivan, et al. (U 4372 and U4554, March 17, 1981) the union was required to provide "an itemized audited statement of . . . receipts and disbursements . . . of any . . . affiliates receiving any portion of revenues from agency fees."  (Reply Brief, at 1)  He argues that the hearing should be reopened to afford him "the opportunity to question representatives from the affiliates about objectionable expenditures."  (Reply Brief, at 1)  In general, decisions of courts interpreting statutes are given only a prospective effect.  Professor Lentner's objection highlights one of the policy reasons courts have applied in giving prospective effect to decisions.  If I were to reopen the hearings the union would have to prepare anew in an area in which it thought it was meeting the requirements of law.  While it was preparing for re-opened hearings subsequent decisions in this much

a particular bargaining unit's employees, it may still be substantially

or essentially related to their terms and conditions of employment

through its effect on building or preserving the strength of the

collectivity.

## The Burden of Proof

As the Supreme Court has observed:

> [s]ince the unions possess the facts and records from
> which the proportion of political to total union
> expenditures can reasonably be calculated, basic
> considerations of fairness compel that they, not the
> individual employees, bear the burden of proving such
> proportion.  Absolute precision in the calculation of
> such proportion is not, of course, to be expected or
> required; we are mindful of the difficult accounting
> problems that may arise.  Brotherhood of Railway and
> Steamship Clerks v. Allen, 373 U.S. 113, 122.

Thus, in my view, the burden of proof was on the union to show that

challenged categories of expenditures did not require refunds.

## AFT and NYSUT

PSC presented a memorandum from the Secretary-Treasurer of NYSUT

setting forth the amount of refund due agency fee payers for the

portion of their agency fee payment that was sent to these two

affiliates. (U-4)  Professor Lentner objected to this on two grounds.

First, he argued that, "the union has no duty as a collective

bargaining agent to affiliate with other unions." (Brief, at 1, emphasis

in original.)  Therefore, it was his position that all monies sent to

the affiliates or expended in participating in the governance of

affiliates should be rebated.  Second, he argued that both NYSUT and

AFT should be required to provide detailed financial statements and

testimony at the hearing in order for PSC to sustain its burden of proof.

While it may be true that PSC has no "duty" to affiliate with other

unions, the inquiry does not end with that statement.  Mr. Cantor, the

Executive Director of PSC, testified to the substantial services

provided by these affiliates in aid of PSC's activities as a collective

- o -

litigated area might require further evidence to be prepared.  The
litigation could become interminable.  Therefore, I believe it
appropriate to continue my original ruling and deny the objection
based on PSC's not producing representatives of its affiliates at the
hearing.

Advertising and Public Relations

     According to its financial statements for the year in question (U-3),
PSC expended $50,673. on advertising and public relations.  Mr. Cantor
testified that this money was used for an advertising supplement
to the New York Times and a conference on "Jobs and the University."
The expenditures were directed at government officials and parents of
potential CUNY students.  PSC sought to convince both groups that CUNY
provides a high quality education for its students.  Given the history
of the University and enrollment projections, the advertising campaign
sought to prevent declining enrollment and the consequent loss of
bargaining unit jobs.

     Professor Lentner argued that this campaign was in part political,
in that it sought to influence governmental officials.  Mr. Cantor
agreed.  Professor Lentner argued that the size of the University and
even its existence are matters of broad public policy.  In his view,
the only legitimate concern of PSC is the terms and conditions of
employment of those it represents in whatever size University public
bodies determine to be appropriate.  Mr. Cantor disagreed.  As Executive
Director of PSC he saw the issue as job security.  In his view the Union
was fighting to avoid the loss of jobs which would result from any
shrinkage in the University.

     It is indisputable that the continued existence of bargaining unit
jobs is the most basic terms or condition of employment.  Absent jobs,
there is nothing to be bargained about.  Since the public employer is

not obliged to bargain over the level of services it provides, the union must address the issue in a different forum.   Through its expenditures on advertising and public relations, PSC attempted to influence public officials and the public to preserve the jobs of bargaining unit employees.   Although the expenditure was political, in part, it was substantially related to terms and conditions of employment. Therefore, the expenditure is not rebatable.

Lobbying Expenses

Mr. Cantor testified that during the fiscal year in question the union expended $6530. on legislative lobbying.   He noted that this was a political activity, but contended that all of the lobbying was more than incidentally related to terms and conditions of employment. Professor Lentner disagreed, contending that expenditures made to lobby for the extension of the agency fee statute were only incidentally related to terms and conditions of employment.

In this area there is a clear legislative mandate which I am not at liberty to ignore.   Although I noted previously that the statutory definition of "terms and conditions of employment" was not wholly adequate for understanding how that phrase is used in the agency fee section of the statute, I also noted that it defines at least a part of what is covered.   According to the statute, "terms and conditions of employment means . . . . agency shop fee deductions . . . ."   Thus, there can be no question of whether agency fee deductions are "only incidentally related to terms and conditions of employment":   they are a term and condition of employment.   Therefore, no refund is required of monies expended in lobbying for an extension of the statute.

The Clarion

PSC publishes an "official" newspaper called the PSC CUNY Clarion ("Clarion").   The editor of the Clarion, Mr. Alexander, described the

paper as a "house organ" with no independent reportorial function.
Professor Lentner objected to the entire newspaper and moved that I
declare all of the expenditures on the Clarion rebatable because the
newspaper "propagandizes on behalf of the union."  I ruled against
the motion and a day of hearing was spent on specific objections to
articles in the Clarion.  Since my ruling on the motion is germane to
my determinations about many of the articles objected to, I will explain
the rationale behind it before discussing the specific articles objected
to at the hearing.

Professor Lentner is correct in asserting that the Clarion
"propagandizes" on behalf of the union in many of its articles.  That
is, the Clarion directly and indirectly espouses the cause of unionism.
In this sense, many of the articles in the newspaper represent
expenditures in aid of a cause of an ideological nature:  unionism.  But
the inquiry under the statute does not stop there.  I am obliged to
determine whether these expenditures are more than incidentally related
to terms and conditions of employment.  I think they are.

A union derives much of its strength at the bargaining table from
the size and solidarity of its membership, the strength of its affiliates,
and the willingness of other unions to make common cause with it on
terms and conditions of employment which transcend the boundaries of the
bargaining unit.  Building a consciousness of solidarity in its membership
and a sense of ties with other unions is vital to a union's success in
the collective bargaining arena.  Nor can this be done solely when
the union is actually engaged in neogtiating a new contract.  To have
the strength to negotiate favorable terms and conditions of employment
a union must constantly promote itself and the ideology of unionism
among the members of the bargaining unit.  Thus, in my view, amounts
expended by PSC for self-promotion and promoting unionism are substantially

related to the terms and conditions of employment of bargaining unit employees at CUNY.

A great many articles which were objected to promote PSC and unionism in general.   They are:

a)   The five part series on unionism begun in October;

b)   October issue, p. 7, "Court rules faculty 'managerial';

c)   November issue, p. 4, "Political Junk Food";

d)   February issue, p. 7, "Help needed for Levittown";

e)   April issue, p. 11, pictures, p. 12, Editorial;

f)   May issue, p. 4, "California organizing";

g)   June issue, p. 6, "Farm workers forced to strike . . .,"
     pp. 8-9, pictorial report, pp. 10-11, reports on activities
     of other unions, p. 16, Editorial.

All of these articles, while ideological, are essentially related to terms and conditions of employment and the expenditures made for them are not rebatable.

Another large grouping of articles objected to report on PSC's lobbying efforts and its expenditures on advertising and public relations.   In my view, if initial expenditures are not rebatable, monies spent on reporting the activities involved also are not rebatable. The articles which fall into this category are:

a)   December issue, p. 1, "Polishook urges independent CUNY,"
     "PSC ad supplement to run Jan. 7," p. 3, pictures which
     accompanied the lobbying story, pp. 10-11, "Howe:   Interim
     report #2," p. 12, "Spreading the word;"

b)   February issue, p. 1, "Final Howe Report. . .," p. 8, "Howe:
     Final Report," p. 12, Editorial and Cartoon;

c)   March issue, p. 2, picture of PSC officials meeting with
     new chairman of the Assembly Committee on Higher Education,

"Regents drop split bargaining proposal," p. 3, "Governance: Key Albany issue;"

d) April issue, p. 1, "CUNY autonomy, funding draw support,"

e) May issue, p. 1, "PSC, NYSUT fight CUNY split," p. 8, Editorial;

f) June issue, p. 16, Editorial.

In addition to these articles, certain other articles reported on PSC positions taken in favor of providing adequate funds to students and keeping tuition low. While these activities were political, they were essentially related to terms and conditions of employment because the ability of students to afford to go to CUNY directly affects enrollment and consequently the number of jobs available for bargaining unit employees. These articles are:

a) December issue, p. 2, picture of Tuition Assistance Program presentation by a PSC official;

b) February issue, p. 3, "PSC protests CUNY, SUNY tuition hike," "Part-time student aid urged;"

c) March issue, p. 3, "Conferees urge aid for part-time students," "AFT asks aid for higher ed;"

d) April issue, p. 3, entire page.

Related to the efforts to assure funding for CUNY students were the efforts to insure that state monies were expended on the public universities, rather than private schools. It is clear that these efforts were undertaken in the belief that the public universities compete with private universities for a limited supply of state dollars. Thus, while the PSC activities in this area are political, they are substantially related to terms and conditions of employment in that they assure CUNY funding, a necessary prerequisite to assuring jobs. These articles are:

a) February issue, p. 1, picture of Poleshook presenting
   PSC report on aid to private higher education, p. 3,
   "Regents ok private college in Bronx,"

b) May issue, p. 3, "Private sector demands more,"

c) June issue, p. 2, "Private sector gets more, again."

Finally, there are a number of articles objected to which I do not
consider political or ideological.  Therefore, no rebate is appropriate
for the following:

a) November issue, p. 13, picture of PSC member who gave
   a speech on his travels on behalf of the International
   Rescue Committee;

b) December issue, p. 4, "Telemachus Lost Again. . .,"
   pp. 5-8, "Report:  The Missions of The City
   University of New York,"

c) February issue, p. 4, "BMCC opens labor studies;"

d) March issue, p. 12, Editorial,

e) May issue, p. 4, review of "Norma Rae,"

f) June issue, p. 13, commencement and valedictory
   addresses.

While none of the objected to articles mentioned above requires a
rebate, others do.  These are discussed below.

As I have previously noted, if an expenditure is not rebatable,
an article reporting it is also not rebatable.  The converse is true.
If an objector's money may not be used by PSC to fund an activity or cause,
it may not be used by PSC to report on that activity or cause.  This is
because the Clarion is not an independent newspaper but the "official" house
organ of PSC.  There is an identity between the union and the newspaper
which makes it impossible to make a realistic distinction between the
"action" of the union and the "report" of the newspaper.  An example may
clarify the point.

In the November Clarion there was a short article entitled "Council endorses candidates," (p. 3)  The article listed the candidates for public office endorsed by the PSC Executive Council.  Mr. Alexander, editor of the Clarion, asserted that this was simply a news report on the activities of the governing body of PSC and not an endorsement of these candidates by the Clarion.  This distinction rests upon the premise that, for purposes of § 208 of the Civil Service Law, the union and its newspaper are separate entities.  The evidence adduced at the hearing does not support any such distinction.  Thus, in my view, "reports" on expenditures which would require rebates also require rebates.

According to Mr. Cantor, VOTE/COPE is the entity which enables union members to provide financial support for political candidates. Contributions to VOTE/COPE are entirely voluntary and no money collected from agency fee payers is used to support it.  Indeed, Mr. Cantor agreed that it would be inappropriate to use agency fee monies to support VOTE/COPE.  Therefore, it seems to me that the money expended on reporting VOTE/COPE activities (November issue, p. 6; March issue, p. 4) is rebatable.  So, too, are the other articles reporting political activities.

In the October issue a picture on page one shows PSC President Polehook shaking hands with the then Vice President Mondale.  The caption explains that Polishook took part in a convention which "passed [a] strong resolution opposing Congressional candidates voting for tuition tax credits."  Mr. Alexander explained that the AFT's opposition to tuition tax credits "advanced terms and conditions of employment."  There was no evidence that the political activity reported was more than incidentally related to terms and condition of employment; therefore, the article is rebatable.

In the February issue there is an article entitled "AFL-CIO faults Carter's anti-inflation proposals." (p. 7) While it was argued that if wage guidelines were imposed by the President they might affect the wages of PSC employees, I believe the relationship is too attenuated and the article is "only incidentally" related to terms and conditions of employment. So, too, with the article in the April issue entitled "Shanker blasts Carter's education budget cuts." (p.11)  The relationship between the national budget for aid to education (which comprises only a portion of the funding for education) and the terms and conditions of employment for PSC unit members is only incidental.  Finally, the article and picture in the May issue, entitled "COSI lauds Sen. Marchi," appears to be related to terms and conditions of employment only in that Sen. Marchi has legislatively favored the College of Staten Island.

The Clarion also reported on certain ideological activities of the union.  The October issue contained an article entitled "Response to Bakke ruling is mixed." (p. 7)  The article primarily reports the view of Albert Shanker, President of AFT, on this affirmative action ruling. Affirmative action is clearly an ideology.  While Mr. Alexander testified that affirmative action is a subject which is important to many people in higher education and which might ultimately effect their terms and conditions of employment, the relationship is only incidental.  Thus, the article is rebatable.

Finally, the article in the June issue, "Union contributes to Special Olympics" (p. 7), is also rebatable.  PSC included the contribution itself in the money previously rebated.  Since the expenditure is rebatable, the article is, too.

To recapitulate, I find the following articles rebatable:

a)  October issue, p. 1, Picture, p. 7, "Response to Bakke . . .;"

b)  November issue, p. 3, "Council endorses candidates," p. 6, entire page;

c)  February issue, p. 7, "AFL-CIO faults Carter;"

d)  March issue, p. 4, "PSC boosts VOTE/COPE;"

e)  April issue, p. 11, "Shanker blasts. . .;"

f)  May issue, p. 7, "COSI lauds Sen. Marchi;"

g)  June issue, p. 7, "Union contributes to Special Olympics."

The Amount of the Rebate

Since I have determined that some of the articles contained in the Clarion require a rebate, it is necessary to provide a formula for the calculation of the appropriate rebate. This involves three issues. First, what costs of the Clarion are to be included in the rebate? Second, should any of the administrative expenses of PSC be included in the overall calculations? Third, what is the proper formula for determining Professor Lentner's pro rata share of rebatable expenses? I will consider these in order.

First, the rebatable expenses of the Clarion must be determined. To do this PSC must calculate the total number of column inches in the Clarion for the fiscal year in question. Then, the number of column inches devoted to the articles I have found rebatable should be determined. From these two a fraction can be calculated. The cost of the Clarion as contained in U-3 ($30,801) should then be multiplied by the fraction to arrive at the rebatable amount. The formula is as follows:

$$\frac{\text{Rebatable column inches}}{\text{Total column inches}} = \text{Fraction X } \$30{,}801 = \text{Rebatable Amount}$$

Professor Lentner argues that the rebatable amount for the Clarion should include some portion of the editor's salary. In addition, he argues that the portion of administrative expenses attributable to making rebatable expenditures should also be rebated. (Brief, at 4)

PSC takes the position that, "The fixed costs are inelastic; they remain the same regardless of the content of The Clarion." (Reply Brief, at 2)  As to other administrative costs, PSC argues, "These costs remain constant despite the PSC activities and therefore cannot be specifically attributed to particular activities as some variable costs arguably might." (Reply Brief, at 2)  While both positions appear plausible, I believe that the PSC view has an essential flaw which requires it to be rejected.  It should be noted preliminarily that the statute speaks of "expenditures by the organization," not "additional" expenditures. Thus, it would seem that any expenditure which is correctly attributable (in an accounting sense) to making rebatable expenditures should also be rebatable.  This view is buttressed by an examination of how the PSC argument would work if it were applied to the rebatable articles in the Clarion.  None of the rebatable articles, if eliminated, would have changed the overall size of the Clarion.  It is not feasible to print, for instance, a five and a half page newspaper.  Hence, the printing and distributing costs would have remained the same, even if the rebatable articles had been eliminated.  The space they occupied would have necessarily been filled with other articles.  Thus, according to the PSC argument, since the cost remains "the same regardless of the content of The Clarion, "(Reply Brief, at 2) no rebate would be appropriat for the objectionable articles.  I do not believe the statute, consistent with Abood, permits such a result.  To hold otherwise would insulate the union from rebating any non-cash expenditures that did not require hiring additional staff or renting additional space.

Since some of the time of the Clarion staff was spent on the rebatable articles, an allocation of their salaries must be made. The testimony at the hearing indicated that there is one full time professional staff member for the Clarion. In addition, Mr. Alexander, Associate Executive Director of the PSC, spends some substantial portion of his time as Editor of the Clarion. Thus the portion of his salary which represents time spent as Editor of the Clarion must also be accounted for in the rebate. The Associate Editor's salary and the portion of Mr. Alexander's salary attributable to his job as Editor should be combined and then multiplied by the same fraction as was determined for computing the rebatable costs of the Clarion (see above), to determine the salary cost allocable to the rebatable articles in the Clarion.

In order to properly allocate administrative costs, three figures must be added together: (1) amounts previously determined by PSC to be rebatable; (2) the amount of rebatable production costs of the Clarion; (3) the amount of rebatable salary costs of the Clarion. This total must then be divided by the net monies available to PSC during the fiscal year in question ("total income" minus "dues to affiliated organizations" plus "dues rebate" = $1,255,342. on an accrual basis). The fraction so obtained should be multiplied by administrative costs ($218,231) to produce (4) the amount of administrative costs rebatable. By adding together items 1-4, the total amount rebatable (5) can be determined. A summary of steps to this point may be helpful.

Step 1:

$$\frac{\text{Rebatable column inches}}{\text{Total Column inches}} = \text{Fraction A} \times \$30,801 = \frac{\text{Rebatable Production}}{\text{Costs (2)}}$$

Step 2:

Associate Editor salary
+ Portion of Editor salary
        Total salary x Fraction A = Rebatable salary costs (3)

Step 3:
    (1)  Amount Previously determined rebatable ($2,878.)
+  (2)  Rebatable production costs
+  (3)  Rebatable salary costs
        $ Total of Step 3

Step 4:
    $ Total of Step 3 = Fraction B x Admin.Costs = Rebatable Admin.Costs (4)
    $1,255,342                ($218,231)

Step 5:
    (1) + (2) + (3) + (4) = Total amount rebatable (5)

    From the total amount rebatable (5) the pro-rata share due objectors
can be determined.

    Professor Lentner argues that since members are not entitled to rebates,
all of the rebatable expenditures should be divided among agency fee
payers.  (Brief, at 4)  PSC argues that, "The statute does not require a
rebate based upon the number of fee payors, or of objectors."  (Reply
Brief, at 3)  The statute only requires that objectors receive their
"pro-rata" share of rebatable expenditures.  In Abood the Supreme
Court cited with approval the decree in Railway Clerks v Allen, 373
U.S. 113, 133 providing for "the refund of a portion of the exacted
funds in the proportion that union political expenditures bear to total
union expenditures."  431 U.S., at 240.  Thus, it seems to me that the
method PSC used, dividing the rebatable amount by the number of unit
members, is appropriate since it reaches the same result.  However,
this calculation is appropriate only to the extent that "unit members"
includes all unit members who paid (in any amount) dues or agency shop
fees.  Any persons for whom neither dues nor fees were collected should
be excluded from the total number because he or she could not have
contributed to "total union expenditures."

EXHIBIT "3"

APR-29-2003 02:48PM   FROM-PSC CUNY                    +2123027815        T-815  P.002   F-210

**$Ccuny /**

*Professional Staff Congress / City University of New York*
25 West 43rd Street • New York, New York 10036 • 212/354-1252 • Fax 212/302-7815
Visit our website at http://www.psc-cuny.org

OFFICERS

Barbara Bowen
President

Steven London
First Vice President

Cecelia McCall
Secretary

John Hyland
Treasurer

Stanley Aronowitz
Blanche Wiesen Cook
Frank Deale
Susan O'Malley
Sheldon Weinbaum
University-wide Officers

Michael Fabricant
Vice President
Senior Colleges

Robert Cermele
Peter Ranis
Nancy Romer
Senior College Officers

Anne Friedman
Vice President
Community Colleges

Louis I. Alpert
Samuel E. Farrell
Ingrid Hughes
Community College
Officers

Peter I. Hoberman
Vice President
Cross Campus Units

Steven Trimboli
Rabbi Weaver
Cross Campus Officers

Marcia Newfield
Vice President
Part-Time Personnel

Irwin H. Polishook
President Emeritus

Israel Kugler
Deputy President Emeritus

Harold Wilson
Vice President Emeritus
Cross Campus Units

STAFF

Deborah E. Bell
Executive Director

Mary Ann Carlese
Associate
Executive Director

Faye H. Alladin
Coordinator,
Financial Services

Debra Bergen
Director, Contract
Administration &
University-wide
Grievance Counselor

Mary Crystal Cage
Director, Public Relations

Barbara Gabriel
Office Manager

Peter Hogness
Newspaper Editor

Diana Rosato
Coordinator, Membership

D. Nicholas Russo
Director, Legal Affairs

Clarissa Gilbert Weiss
Director, Pension
And Welfare Benefits

October 17, 2002

Professor Howard H. Lentner
Baruch College
Political Science Department
17 Lexington Avenue
New York, New York 10010

Re: Agency Fee Refund for F/Y 2000-2001

Dear Professor Lentner:

Enclosed you will find a check in the amount of $637.52 which represents the refund to you of the balance of the agency fee for the fiscal year 2000-2001 ($ 59.14 having been previously refunded).

The decision to return these funds was made in recognition of the fact that defending against your challenge would require the expenditure of members' dues and fees money in excess of the cost of returning the fees to you.

Please understand that the refunding of this amount is not to be construed as an admission by the union of any statutory violation nor should you rely on it as a precedent inasmuch as the decision regarding future fiscal years' agency fee challenges will be based upon the facts and considerations then existing.

Very truly yours,

Deborah E. Bell
Executive Director

Enclosure

DEB/lmm
Opeiu #153

American Association of University Professors
American Federation of Teachers Local 2334 • New York State AFL-CIO

PROFESSIONAL STAFF CONGRESS

DAVID SEIDEMANN

| | Invoice No | Date | Amount | Discount | Net Amount |
|---|---|---|---|---|---|
| AGENCY FEE REFUND | | 10/16 | FISCAL YEAR 2000-01 | | |
| | | | 637.52 | 0.00 | 637.52 |
| | | | TOTAL= | | $637.52 |

DATE
10/16/02

CHECK NUMBER
00043889

PROFESSIONAL STAFF CONGRESS
25 WEST 43RD STREET
NEW YORK, NY 10036

**** SIX HUNDRED THIRTY SEVEN & 52/100 DOLLARS

THE BANK OF NEW YORK
NEW YORK, NY 10036
1-1-210

00043889

43889

PAY

TO THE
ORDER
OF:

DAVID SEIDEMANN

DATE
10/16/02

AMOUNT
*******$637.52

Security Features included.   Details on back.

⑆043889⑆ ⑆021000018⑆ 00000859⑈

APR-29-2003  02:48PM    FROM-PSC CUNY               +2123027815            T-815   P.001   F-210

[Click here and type address]

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Chris Callagy | Fax: | 212-995-2347 |
| From: | Nick Russo | Date: | 4/29/2003 |
| Re: | Bowen etc. advs. Seidemann | Pages: | 3, including cover sheet |

☐ Urgent        ☐ For Review        X Please Comment        X Please Reply        ☐ Please Recycle

Chris:

With regard to plaintiff's document request: This is an inquisition, not a document request.

As to items regarding fiscal year 2000-01: We already refunded his full agency fees, plus interest. See the two sheets faxed herewith.

The remainder is, as indicated above, more than burdensome and would require many people working fulltime for many days to put together. Frankly, we just don't have the staff to dedicate to that kind of a task unless we stopped other work for an undue period of time.

Let me know what you recommend. Thanks a lot.

        —Nick



## AFFIDAVIT OF EXPRESS MAIL SERVICE

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF NEW YORK  )

     DIANNE DUGAN, being duly sworn, deposes and says, I am not a party to the action, am over 18 years of age and on September 27, 2004, I served a copy of the **Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment** in the following manner:

     By mailing the same in an Express Mail sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York (via express mail), addressed to the last known address of the addressee(s) as indicated below:

             David Seidemann
             38 Garfield Avenue
             North Haven, Ct 06473

                                       DIANNE DUGAN

Sworn to before me this
27th day of September, 2004

NOTARY PUBLIC

MARIA ISABEL LAPPIN
NOTARY PUBLIC, State of New York
No. 01LA4987772
Qualified in Nassau County
Commission Expires 10/21/05